# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00620-CV

**Melissa Kerlick, Appellant**

**v.**

**Conan Kerlick, Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 433RD JUDICIAL DISTRICT
NO. C2014-0569D, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Melissa Kerlick appeals a final modification order under Chapter 156 of the Family Code that imposed a number of terms detrimental to her and favorable to her ex-husband, appellee Conan Kerlick. Melissa's issues on appeal—five in all—warrant only a modification of the order to remedy an error in an attorney's fee award.[1] As modified, we will affirm the order.

Melissa advances two basic categories of appellate challenges: (1) challenges to order provisions restricting her access to the child; and (2) challenges that center on the order's financial aspects or implications.

---

[1] Because the parties share a common surname, we will identify them by first names for clarity.

## THE CHILD

Melissa and Conan were divorced in 2004, and there was a single child of their marriage, a son born in 2001. The original decree had named the parties joint managing conservators, with Melissa having the exclusive right to determine the child's primary residence, but that relationship had been modified in 2010 to provide for split possession, with each party having possession of the child on designated weekdays and alternating weekends and holidays. The 2010 order had also included provisions enjoining both parties from being under the influence of controlled substances during a period of possession and allowing either party to require drug testing of the other. The timing of this order corresponded roughly to a 2010 episode, acknowledged by Melissa, in which she, then a New Braunfels middle-school teacher with eight years of service, had been forced to resign after she had inexplicably failed to show up at work on at least two occasions. It appears undisputed that the incident was related to methamphetamine use by Melissa, and she later acknowledged having undergone drug-treatment counseling thereafter in which she had admitted to use of the substance dating back to her teens.[2]

The chief thrust of Conan's arguments and evidence preceding the modification order on appeal was that Melissa had since spiraled downward more deeply through methamphetamine use, addiction, and even illicit trafficking of the substance, with attendant instability and disarray in her life, home, and capacity as a parent, endangering the child's well-being. Conan filed a motion seeking modification following Melissa's April 2014 arrest at a New Braunfels truck stop on charges of possession with intent to deliver methamphetamine in amounts between one and four grams,

_____

[2] Melissa was approximately forty years of age at that time.

a second-degree felony.[3]  According to testimony presented at the final hearing, Melissa had gone to the truck stop at least in part to assist a friend who had been involved in an automobile accident nearby (though Melissa also referenced prior plans to borrow money from the friend).  The arrest occurred, according to a New Braunfels Police Department narcotics detective who testified, after Melissa aroused the suspicions of law enforcement on the scene through evasive, suspicious behavior, and by manifesting outward signs of methamphetamine use like extreme anxiousness and sores on her skin.  It also turned out, according to the detective, that Melissa had already shown up on law-enforcement's radar as a suspected local methamphetamine dealer, explaining that confidential informants had reported making buys in her house as early as 2013.  An ensuing open-air sniff by a police canine unit led officers to Melissa's purse, wherein she had concealed small baggies containing what proved to be roughly three grams of methamphetamine, a pill bottle containing methamphetamine residue, additional empty baggies, and a digital scale.

There followed a search of Melissa's house pursuant to warrant that uncovered more methamphetamine—roughly another three grams—with more baggies, all hidden in a safe, as well as a glass pipe of the sort used to smoke the substance.  Also of note, according to the detective, was a surveillance camera system around Melissa's house that corroborated informant accounts that Melissa had used such a system to avoid detection by law enforcement.

But of equal if not greater emphasis in these proceedings was the fact that this house in which she had admittedly kept methamphetamine and allegedly even sold it was the same one in which she exercised possession of her son.  In fact, it happened that Melissa's arrest had

---

[3]  *See* Tex. Health & Safety Code §§ 481.102(6), .112(a), (c).

occurred during one of her periods of possession. She had left her son, then twelve years of age, alone in the house while she made her fateful trip to the truck stop. Law enforcement who were subsequently dispatched to check on the child's welfare found him alone in a house without electricity or running water—Melissa had failed to pay the utility bill. Officers also reported that the house smelled of urine.[4]

These circumstances had prompted Child Protective Services to intervene, and the parties had signed a safety plan under which Melissa was to have no contact with the child. A temporary restraining order and later temporary orders obtained by Conan imposed the same restriction.[5] The child had also begun a regimen of therapy with a counselor with the Children's Advocacy Center of Comal County. Through a pleading Melissa filed, she had requested access limited to writing letters to her son, adding that those communications could be screened by the therapist if warranted. At some point, CPS or the therapist saw fit to permit this means of access, but Melissa admitted sending the child only a single letter during an intervening 2-3 month period leading up to the final hearing.

The final hearing was tried to the bench, following which the district court signed a final order naming Conan sole managing conservator and restricting Melissa's access in a manner similar to that which had evolved in the interim. Her access was limited to writing letters directed to the child's therapist, who would "review and determine if the letters are appropriate to give to the

---

[4] Although there was evidence that Melissa had pet dogs and cats, the source of the urine and smell remained unexplained.

[5] These earlier orders were signed by a Guadalupe County district court, which had been the court of continuing jurisdiction. The proceedings were transferred by agreed order to Comal County, where the child then resided.

child."  The order left open the possibility of expanded access at some later time, with the therapist to "determine the terms of future access" between the child and Melissa.  There was "good cause" for these restrictions, the order specified, "based upon [Melissa's] neglect of the child, her arrest for methamphetamines and her admitted use of methamphetamines."

Melissa does not dispute that the evidence sufficed to establish the requisite "material and substantial change" that afforded the district court discretion to modify the 2010 order in the child's "best interest."[6]  Her focus, rather, is contesting whether the district court acted within its discretion in making modifications in the cause of the child's best interest.  Trial courts have wide latitude to determine what is in a child's best interest,[7] and appellate courts accordingly will disturb those determinations only when a clear abuse of discretion appears from the record as a whole.[8]  A trial court "abuses its discretion" only if it acts in an arbitrary and unreasonable manner or without reference to any guiding rules and principles,[9] and this does not occur merely when a trial court decides an issue within its discretion differently than the appellate court would.[10]  Within this analytical framework, we address challenges to the existence or adequacy of evidence to support the order through a two-pronged inquiry, determining (1) whether the trial court had sufficient evidence

---

[6]  *See* Tex. Fam. Code § 156.101(a)(1)(A).

[7]  *See, e.g., Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (identifying non-exhaustive list of factors courts may consider in determining best interest).

[8]  *See Gillespie*, 644 S.W.2d at 451; *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

[9]  *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

[10]  *See id.* at 242; *Echols*, 85 S.W.3d at 477.

upon which to exercise its discretion, which incorporates the familiar standards of legal and factual-sufficiency review; and (2) whether the trial court's decision on that evidence was arbitrary or unreasonable.[11]   Further, where no findings of fact and conclusions of law were made—and that is the case here[12]—we infer that the trial court (the fact finder here) made any fact findings necessary to support its order and may affirm on any legal theory the evidence supports.[13]

In her first issue on appeal, Melissa insists that the district court violated her Fifth Amendment right against self-incrimination.  Her predicate for this complaint is an exchange she had with the district court while she was testifying during the final hearing.  Conan had called Melissa (who was then pro se[14]) adversely as his first witness, and his counsel had promptly elicited

_____

[11]   *See Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied). When conducting a legal-sufficiency review, we must view the evidence in the light most favorable to the trial court's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).  Moreover, we must indulge every reasonable inference that would support the trial court's findings. *Id.* at 822.  The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the findings under review. *See id.* at 827.  When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).  We must not merely substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

[12]   While Melissa did make a request for findings of fact and conclusions of law, none were made, and she does not complain on appeal of any error in that regard.

[13]   *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

[14]   When the hearing began, Melissa requested "some time to retain a lawyer," claiming that "I don't have money to pay for a lawyer right now" but would have such funds following the sale of her home, which was set to close a few weeks afterward.  Melissa would later contradict herself on this claim, indicating that she had needed only to ask her mother for the necessary funds (and the nature of her attempted explanations, like other testimony, tended to reinforce the overall image of drug-addled dishevelment that Conan was attempting to portray).  Conan's counsel objected to the

6

numerous admissions from her regarding her longstanding methamphetamine use or "problem"; that she had possessed methamphetamine, baggies, and a digital scale when arrested and had more drugs at home; that she had left her son home alone when she went to the truck stop; and that the utilities had been disconnected due to her failure to pay the bill. But Melissa denied that she had sold methamphetamine, as opposed to merely using it (the charges were still pending, though Melissa was out on bail[15]) and she attempted to explain away the baggies by claiming she used them in a legitimate undertaking of selling "jewelry" or "beads." This prompted Conan's counsel to inquire incredulously, "So I guess you probably need that scale to weigh out your jewelry?" Melissa responded by urging, "I haven't got to court for any of these charges yet" and "haven't been found guilty of anything." She added, "I am not comfortable discussing the details of that with [counsel]." To this, the district court responded, "Comfort is not an issue" and instructed Melissa that she was required to answer the question. As Melissa continued to protest, talking over the district court at times, the court uttered the statement on which she founds her first issue: "This is not a criminal proceeding. You are not entitled to the Fifth Amendment. Answer the question."

---

further delay Melissa had sought, urging that "this child's life should [not] be on hold because his mother is a drug addict" and observing that Melissa had already had roughly three months in which to obtain counsel, yet "she's done nothing." Treating Melissa's request as an oral motion for continuance, the district court overruled it and proceeded with the final hearing. Melissa thereafter retained counsel who assisted in postjudgment proceedings and this appeal. Melissa, through counsel, does not complain of any error or abuse of discretion in the district court's denial of her continuance motion. Nor does she claim any special protection or favor due to her pro se status—or could she. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978) ("Litigants who represent themselves must comply with the applicable procedural rules," as otherwise "they would be given an unfair advantage over litigants represented by counsel.").

[15] The record does not reveal whether or how the criminal charges were ultimately resolved.

7

To the extent the district court's utterance was transcribed accurately and meant literally, it was an incorrect proposition of law, as Conan acknowledges. The privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory."[16] Melissa emphasizes the district court's obvious misstatement in an attempt to paint the judge and the proceedings in a bad light. However, she has failed to demonstrate any actual deprivation of her right against self incrimination, let alone any harm therefrom.

As Conan points out, Melissa ultimately never answered the pending question about the digital scale. Instead, immediately after the district court's instruction that she "[a]nswer the question," Melissa professed that she did not "understand what [counsel] wants me to say." To this, the district court responded that "the truth [was] what [counsel] wants you to say." At this point, counsel abandoned the inquiry for the time being, posing a new question inquiring as to how Melissa had made bail. Consequently, assuming without deciding that Melissa's resistance to the question about the digital scale should be construed as an invocation of her right against self-incrimination, there was no deprivation of that right because Melissa never answered the question. Nor did any invocation at that juncture serve to preserve a Fifth Amendment complaint as to any of the questions that followed. In civil proceedings, unlike criminal ones, there is no right to make a blanket assertion of the privilege against self-incrimination and refuse to answer any questions.[17]

---

[16] *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (noting also that the privilege "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used").

[17] *See Allen v. Illinois*, 478 U.S. 364, 375 (1986); *Murray v. Texas Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 366 (Tex. App.—Austin 2009, no pet.); *In re Speer*, 965 S.W.2d 41, 46 (Tex. App.—Fort Worth 1998, orig. proceeding).

8

Instead, the privilege must be asserted on a question-by-question basis.[18] Melissa claims to have invoked her Fifth Amendment rights only on the single occasion already mentioned, so she has not preserved any such complaint as to other questions.

More critically, this matter of whether Melissa would or would not admit to dealing methamphetamine was merely a tangential skirmish in the overall litigation. Conan went on to present evidence of Melissa's drug dealing through a more direct means—the testimony of the narcotics detective. The detective opined that the amount of methamphetamine in Melissa's possession and the accompanying baggies and scale were indicative of one who sold the substance and did not merely use it. And the detective added, as noted previously, that confidential informants had previously reported making buys in Melissa's house as early as 2013. Further, the material issues in this proceeding were not whether Melissa sold methamphetamine, per se, but whether the modifications ordered by the district court were in the child's best interest. Melissa has failed to demonstrate how the district court's utterance—ultimately a mere abstract though erroneous statement of law—had any material effect on its final order. We overrule Melissa's first issue.

In Melissa's second issue, she urges that the final order "stripped [her] of nearly all parental rights" and was therefore an abuse of discretion. She does not contest the portion of the order naming Conan sole managing conservator; her focus, rather, is the provision restricting her access to letters that are screened by the child's therapist, with the therapist likewise determining the terms of any expanded access in the future. Whatever the potential merits of this complaint, Melissa waived it by explicitly agreeing to these very restrictions during her testimony. We would further

---

[18] *See Murray*, 294 S.W.3d at 366.

observe that the evidence here is perhaps more typical of appeals in which we affirm the termination of parental rights altogether. We overrule Melissa's second issue.

**MONEY**

Melissa's remaining issues center on financial aspects or implications of the final order. The gist of these complaints is that we must credit attempts she made during the hearing to portray herself as essentially destitute (e.g., suggesting at times that she could not afford food for herself) and that the district court abused its discretion in imposing requirements with which she could not possibly afford to comply. But the evidence of Melissa's financial situation—including her own testimony and admissions—was much more varied than she acknowledges, and ultimately enabled the district court to discount her claims of poverty.

In her third issue, Melissa complains that the district court abused its discretion in requiring her to pay $350 per month in child support. Her focus is solely the amount she was ordered to pay, which, as she correctly observes, would exceed the amount yielded by applying the presumptive statutory guidelines to the presumptive or default baseline of federal minimum wage,[19] which would have been approximately $207 per month. The final order does not reflect that the district court saw fit to deviate from guideline child support,[20] as Conan seems to acknowledge, so the support award must rest on implied findings that Melissa's monthly net resources were at least $1,750 ($21,000 if annualized), the amount that would be multiplied by 20% (the guideline

---

[19] *See* Tex. Fam. Code § 154.068.

[20] *See id.* § 154.130.

10

percentage for a single child) to yield the court's $350 per month figure.[21]  The gravamen of Melissa's argument is that Conan failed to present legally sufficient evidence that her net monthly resources were anything close to $1,750.

Resources that are to be considered in calculating child support include:

(1)     100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses);

(2)     interest, dividends, and royalty income;

(3)     self-employment income;

(4)     net rental income (defined as rent after deducting operating expenses and mortgage payments, but not including noncash items such as depreciation); and

(5)     all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits other than supplemental security income, [veteran's] disability benefits . . ., unemployment benefits, disability and workers' compensation benefits, interest income from notes regardless of the source, gifts and prizes, spousal maintenance, and alimony.[22]

The court may also consider earning potential rather than actual earnings if his or her actual income "is significantly less than what the obligor could earn because of intentional unemployment or underemployment."[23]  Once resources are determined, the court is to deduct social security taxes,

----

[21]  *See id.* § 154.125.

[22]  *Id.* § 154.062(b).

[23]  *Id.* § 154.066.

federal income taxes, and certain other matters not relevant here to determine the net resources available for child support.[24]

The evidence relevant to Melissa's resources was confined chiefly to her own testimony. Her attempts to claim impoverishment centered on the undisputed fact that she had not held any conventional employment since resigning her teaching position in 2010. Her chief (legitimate) earnings, she claimed, were from "tutoring for some friends' kids" and "some secretarial work," which yielded her, she asserted, no more than $1,000 per month.

On the other hand, Melissa admitted that she had not pursued conventional employment, either (although she insisted she had "thought long and hard about getting a job"). She further acknowledged holding a Bachelor of Science in Interdisciplinary Studies and Curricula and having taught middle-school students for eight years. She downplayed the significance of her education, however, professing that she could not find teaching work in a school, at least locally, and that the certification board would likely revoke her teaching certificate in light of her criminal charges. There was no further testimony developed regarding the financial impact of the criminal charges or conviction, but we note that there is no presumption that Melissa would lack assets if she were incarcerated.[25]

More critically, Melissa admitted to having additional sources of funds. For several years, she acknowledged, her late father's estate had made payments to her in an annual average

---

[24] *Id.* § 154.062(d).

[25] *See Monroy v. Monroy*, No. 03-10-00275-CV, 2011 WL 3890401, at *5 (Tex. App.—Austin Aug. 31, 2011, pet. denied) (mem. op.) (citing *In re M.M.*, 980 S.W.2d 699, 700–01 (Tex. App.—San Antonio 1998, no pet.)).

amount of approximately $11,000 each for both her and her son (i.e., totaling $22,000 on average each year). She represented that these payments had ended, but the credibility or weight of that claim was for the district court to determine. Melissa also divulged that she would imminently be closing on the sale of her house and would realize a cash gain of approximately $35-40,000. There was also evidence that Melissa relied regularly on additional gifts from her mother, and Conan testified that this had been Melissa's chief source of support since resigning from her teaching job. Finally, while professing destitution, hunger, and the like, Melissa notably had not claimed (let alone established) indigent status; had managed to retain counsel in her criminal case (to whom she had paid $1,800 of a $5,500 agreed-upon retainer); and had divulged during her testimony that she needed only to ask her mother for the funds necessary to retain counsel in the present proceeding.[26] Similarly, while her testimony on the issue was inconsistent, Melissa admitted that her nonpayment of the utility bill had been a result of her being "irresponsible" rather than any inability to afford the payment.

While Melissa suggests that we must credit her self-portrayal of abject poverty, the credibility and weight of her testimony was for the district court to determine. From evidence of Melissa's impending home sale, gifts or support from her family of origin, and the credibility determinations it could have made, the district court could have reasonably found that Melissa actually had net available resources well in excess of $1,750 per month ($21,000 if annualized), the amount that would yield the court's $350 child-support award under the statutory guidelines. We overrule her third issue.

---

[26] And, as noted previously, Melissa subsequently obtained counsel who represented her in post-judgment proceedings and this appeal.

In her fourth issue, Melissa urges that the district court abused its discretion in awarding Conan attorney's fees in the amount of $11,521.60. She appears to argue both that the district court lacked statutory authority to make any such award and that the amount of the fees is "unreasonable" because, she insists, she cannot afford them. To the contrary, the award was authorized by the Family Code's general fee-shifting provision,[27] and Conan, through the testimony of his attorney, presented sufficient evidence to prove up the amount as reasonable and necessary.

The order also purported to award these fees as "necessaries" or additional child support, and Melissa challenges this aspect of the award as well. This complaint has merit—the Texas Supreme Court has clarified recently that trial courts lack authority to award attorney's fees as necessaries or additional child support in non-enforcement modification suits under Family Code chapter 156.[28] Conan pleaded his suit solely as a modification action under chapter 156; consequently, the district court lacked authority to award the fees as it did. To this extent, we sustain Melissa's fourth issue and will modify the final order to delete the language characterizing the fees as necessaries or additional child support.

In her fifth and final issue on appeal, Melissa complains of order provisions that required her, as with the 2010 order, to undergo drug testing at Conan's request, pay for any tests Conan requested of her, and maintain a cell phone with texting function through which she could be contacted. Melissa insists that the district court abused its discretion because she cannot

[27] *See* Tex. Fam. Code § 106.002 ("In a suit under this title, the court may render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney" and "may be enforced in the attorney's name by any means available for the enforcement of a judgment for debt.").

[28] *See Tucker v. Thomas*, 419 S.W.3d 292, 295–300 (Tex. 2013).

14

possibly afford to comply. As previously demonstrated in connection with Melissa's third issue, the district court was within its discretion to determine otherwise on this evidence. We overrule Melissa's fifth issue.

## CONCLUSION

We modify the final order to delete language characterizing the attorney's fees awarded as necessaries or additional child support. As modified, we affirm the order.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Pemberton and Field

Modified and, as Modified, Affirmed

Filed:   August 24, 2016