

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00124-CV

———————————————

IN THE INTEREST OF A.B. AND A.R., CHILDREN

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-612348-17

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant Mother challenges the trial court's termination of her parental relationship with two of her children, A.B. (Abigail) and A.R. (Andrew). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (P), (b)(2). She claims that the trial court erred by (1) finding, without factually sufficient evidence, that termination was in Abigail's and Andrew's best interest; and (2) admitting into evidence three allegedly irrelevant judgments of conviction. Because the trial court's best-interest findings were supported by ample evidence that Mother had not and could not provide a safe, stable home for Abigail or Andrew, and because Mother's pattern of incarceration—which includes her objected-to convictions—was directly relevant to the trial court's best-interest finding, we will affirm.

## I. Background

Mother gave birth to Abigail in late 2014, and three days later, she left the baby with her mother (Grandmother) and her stepfather (Grandfather). As Grandfather remembers it, Mother brought Abigail to his house and just "le[ft] th[e] baby crying on the couch," "abandon[ing]" her. Grandmother and Grandfather took care of Abigail from then on. And a few years later, Grandmother was appointed as Abigail's sole managing conservator.

But in mid-2020, when Abigail was about five years old, Grandmother took Abigail to the hospital, and while there, Grandmother admitted to using cocaine. Consequently, the Department of Family and Protective Services stepped in. Because

Grandmother continued to test positive for cocaine,[1] because other family placements also returned "concern[ing]" drug-test results, and because a drug test of Abigail indicated that she, too, had been exposed to cocaine, the Department petitioned to remove Abigail and to terminate Mother's parental rights.

Around that same time, in August 2020, Mother gave birth to Andrew. Andrew was born with significant health issues, and both he and Mother tested positive for cocaine. Mother's medical records later revealed that, while pregnant, she had used not only cocaine, but also alcohol, marijuana, and tobacco.

The trial court authorized the Department to place Abigail in foster care, and the Department worked with Mother to enroll her in a drug treatment program. During her time in the program, Mother completed parenting classes, attended Narcotics Anonymous meetings, and received counseling. But when Mother completed the program in late 2020, she struggled to find safe housing, and after Mother had a physical altercation at Grandmother's house,[2] the Department amended its petition to terminate Mother's parental rights to Andrew.

---

[1]Grandmother tested positive for cocaine in February 2021 and June 2022, and she refused to take more than 20 other drug tests requested of her. She started a drug treatment program at one point, but she did not complete the program.

[2]The events that led to Andrew's removal were not discussed at trial. According to the removal affidavit in the court's file, though, when Mother was released from her drug treatment program, she could not find housing, she began staying with Grandmother, and she and Grandmother got into a physical altercation.

The trial court issued orders authorizing Andrew's placement in foster care and requiring Mother to comply with the Department's service plan as a condition of Mother's reunification with her children. The Department's service plan required Mother to, for example, submit to regular drug testing, complete domestic-violence classes, secure stable housing, and find a job.

But Mother did not complete her court-ordered service plan. She refused to submit to drug tests, and within a year, she had returned to jail. When the termination trial began in March 2022,[3] Mother was still incarcerated, so the trial court recessed the remainder of the trial for a year[4] to "come back at a later date to where [Mother] c[ould] hopefully be [t]here for the trial."

---

[3]In July 2021 and October 2021, the trial court entered orders retaining the case on its docket and extending the date for automatic dismissal under Section 263.401 of the Family Code. *See* Tex. Fam. Code Ann. § 263.401(b). The case's final dismissal date was set for April 1, 2022. *See Forty-Third Emergency Order Regarding COVID-19 State of Disaster*, 629 S.W.3d 929, 930 (Tex. 2021) (taking effect October 1, 2021, and authorizing trial court to extend dismissal deadline "for a stated period ending no later than April 1, 2022").

[4]The Department first filed its petition for protection of Abigail in 2020, and it amended its petition to add Andrew later that year. Because the cases were filed before September 1, 2021, the trial court was not bound by Family Code Section 263.4011. *See* Tex. Fam. Code Ann. § 263.4011 (requiring a trial court to "render a final order not later than the 90th day after the date the trial commences" unless the court extends the 90-day period in writing and for good cause); *In re E.A.R.*, No. 04-22-00800-CV, 2023 WL 4095940, at *2 (Tex. App.—San Antonio June 21, 2023, pets. denied) ("[S]ection 263.4011 became effective on September 1, 2021, and applies only to a suit filed by the Department on or after its effective date.").

4

Yet, upon Mother's release from jail, she still refused to take her court-ordered drug tests, she attended fewer than five visitations with her children, and she failed to secure verifiable housing or employment. When the termination trial reconvened, even though Mother was out of jail, she did not attend.

At trial, the Department presented evidence that Mother had an ongoing drug and alcohol addiction, that she had abdicated her parental duties to Grandmother and Grandfather, and that she had been "in and out of jail" for years.

After hearing the evidence, the trial court found that termination was in the children's best interest and that Mother had endangered the children through conduct, endangered the children through their environment, constructively abandoned the children, failed to comply with the court-ordered service plan, and used a controlled substance in a manner that endangered the children.[5] *See id.* § 161.001(b)(1)(D), (E), (N), (O), (P). Although Grandfather had petitioned to be appointed as Abigail's sole managing conservator, the trial court concluded that he could not (or would not) protect Abigail from Grandmother—who continued to struggle with cocaine use—so the court appointed the Department as sole managing conservator for both children.

---

[5]By the end of the termination trial, Abigail was eight and Andrew was two.

5

## II. Best Interest

In the first of Mother's two issues,[6] she claims that there was factually insufficient evidence to support the trial court's best-interest findings.

### A. Standard of Review

To terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence[7]: (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. *Id.* §§ 161.001(b)(1), (2), 161.206(a); *In re J.F.-G.*, 627 S.W.3d 304, 311–12 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The second element is at issue here.

When reviewing the factual sufficiency of a clear-and-convincing best-interest finding, we must "weigh[] disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The factfinder is the

---

[6]We have reordered Mother's issues for organizational purposes.

[7]Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

sole arbiter of the credibility and demeanor of witnesses; we may not supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006).

## B.    Applicable Law

The best-interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631; *see In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, pet. denied) (mem. op.). "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent," *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), but this presumption may be overcome by clear and convincing evidence to the contrary. *Cf. In re C.H.*, 89 S.W.3d 17, 23–26 (Tex. 2002) (emphasizing that "[w]hile parental rights are of constitutional magnitude, they are not absolute").

In our review of the evidence supporting a best-interest finding, we consider several factors, including (1) the children's emotional and physical needs, (2) the children's emotional and physical safety, (3) the parent's parental abilities and conduct indicating an improper parent–child relationship, (4) the parent's plans for the child and the stability of the home, (5) the programs available to assist the parent, and (6) any excuses for the parent's acts or omissions. *See A.C.*, 560 S.W.3d at 631; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing additional factors for permanency hearings pertinent to safe placement). These factors are neither exhaustive nor exclusive. *C.H.*, 89 S.W.3d at 27; *A.S.*, 2020 WL 2071944, at *7.

## C. Best Interest of Abigail and Andrew

All six listed factors[8] support the trial court's findings that termination was in the children's best interest.

### 1. The children's safety

"[T]he [c]hildren's safety is . . . a key focus of the best[-]interest analysis," and "the prompt and permanent placement of . . . child[ren] in a safe environment is presumed to be in the child[ren]'s best interest." Tex. Fam. Code Ann. § 263.307 (listing best-interest factors); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *15 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.); *see Holley*, 544 S.W.2d at 371–72 (listing "the emotional and physical danger to the child now and in the future" as best-interest factor). Here, the evidence of Mother's consistent drug use supported a finding that she presented a danger to the children.

---

[8]We may also consider the children's desires. *Holley*, 544 S.W.2d at 371–72 (listing "the desires of the child" as best-interest factor). But at the time of the termination order, Abigail was only eight years old, and Andrew was only two, so neither was mature enough to express a placement preference. *See In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *10 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.) ("None of the Children testified at trial, and all four of them were under ten at the time of trial and therefore too young to express their desires."); *In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *18 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g) (concluding that five-year-old child "did not possess sufficient maturity to express an opinion regarding a parental preference"); *cf.* Tex. Fam. Code. Ann. § 153.134(a)(6) (listing best-interest factors for trial court's appointment of parents as joint managing conservators and including the child's preference as best-interest factor "if the child is 12 years of age or older"), § 156.101(a)(2) (providing similar best-interest consideration in modification context).

Illegal drugs "can impair or incapacitate the user's ability to parent." *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at \*6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) (discussing endangerment predicate ground and noting impact of narcotics on the user's ability to parent); *see In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at \*4 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.) (quoting *M.M.*). And Mother had a long history of abusing illegal drugs to her children's detriment.

There was evidence that Mother's drug use contributed to her—in Grandfather's words—"abandon[ment]" of Abigail. When the Department first became involved with the case in mid-2020, Grandmother explained that she had taken care of Abigail since Abigail's birth because Mother "had been using drugs," was "in and out of jail," and "was sick." Grandmother and Grandfather had been caring for Abigail for five years at that point, but Mother's medical records confirmed that she was still abusing drugs. And because she was pregnant with Andrew at the time, her drug use directly jeopardized his health and safety as well.

Mother found out she was pregnant with Andrew in December 2019, and in early 2020, she went to the hospital for a "check up on [her] baby." Despite being pregnant, Mother told her medical providers that she "use[d] crack cocaine and marijuana," that she had started using "years ago," and that she had last used crack cocaine "2 days" before her hospital visit. She also reported drinking "3–4 24 ounce beers/ day," she stated that she "start[ed] drinking in the AM and dr[a]nk[] all day (every day)," she

9

complained of "withdrawal symptoms when she d[id] not consume alcohol," and she estimated that she had smoked about "10 cigarettes daily" for the preceding 19 years.[9]

While Mother's subsequent arrest and incarceration provided a hiatus from these habits, when she got out of jail in July 2020—still pregnant with Andrew—she returned to her drug abuse. At the time of Andrew's birth, both he and Mother tested positive for cocaine. *See A.N.*, 2022 WL 2071966, at *4 (discussing endangerment predicate finding and rejecting "premise 'that there is some level of drug use while pregnant that is acceptable or harmless to the child'" (quoting *In re C.W.*, No. 02-14-00274-CV, 2014 WL 7139645, at *5 (Tex. App.—Fort Worth Dec. 12, 2014, no pet.) (mem. op.)).

Even when Mother's parental rights were on the line, she continued to use drugs. Although Mother enrolled in a drug treatment program soon after Abigail's removal, Mother later started using drugs again. Despite a court-ordered service plan requiring her to submit to regular drug tests as a condition of reunification with her children, she refused to submit to them, which the trial court could assume was because the test results would have been positive.[10] *See In re E.T.*, No. 02-22-00299-CV, 2022 WL

---

[9]Mother's medical records also reflect that she had used methamphetamine in the past, most recently in 2019—during the time period in which Grandmother and Grandfather were caring for Abigail.

[10]Although the caseworker testified that she texted Mother to let her know the location of the drug tests, on cross-examination, the caseworker conceded that she could not confirm that Mother received the text messages and that Mother often lacked reliable cell phone service. But the caseworker also testified that she communicated the drug-test information to Mother's attorney via email. Moreover, Mother was required

10

17172492, at *6 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) (noting presumption when parent failed to submit to drug tests); *In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *7 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.) (similar); *In re J.W.*, No. 2-08-211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) ("A factfinder may . . . reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs."). Such "evidence of past drug use and [Mother's] refusal to submit to drug testing supports a finding that [Mother] endangered the child[ren]'s emotional and physical needs and posed a danger to the[m]." *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. filed) (mem. op) (conducting best-interest analysis when father had "tested positive for methamphetamines repeatedly" and "failed to submit to requested drug testing," and noting that "as to future drug use, a factfinder may measure a parent's future conduct by his past conduct").

### 2. Mother's stability and plans

Just as Mother's drug use threatened her children's safety, her consistent use of illegal drugs "demonstrated a pattern of lawbreaking that created instability and a looming threat of incarceration." *A.O.*, 2022 WL 1257384, at *15 (weighing stability

---

to update the Department regarding her contact information, and Mother was aware that she was required to submit to monthly drug testing.

11

best-interest factor in favor of termination when Mother demonstrated pattern of lawbreaking).

"[C]hildren need permanency and stability." *M.S.*, 2021 WL 2654143, at *19 (quoting *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied)); *see Holley*, 544 S.W.2d at 371–72 (listing "the stability of the home or proposed placement" as best-interest factor). Yet, Mother had a pattern of incarceration.

When Mother was pregnant with Andrew in 2020, she told medical personnel that she had been "in and out of jail all her life," that she had served "[m]ultiple jail sentences," and that she had a "long legal history of being in jail since she was young." The Department's investigator recalled Grandmother's describing Mother in a similar fashion; Grandmother told the investigator that part of the reason Mother had been absent in Abigail's life was because Mother had been "in and out of jail."

The investigator summarized Mother's criminal history as including "a lot of assaults, and then the driving while intoxicated, and then there were several prostitution charges." And Mother's medical records provided additional details on the extent and timeline of her visits to jail. Her records referenced a jail visit in 2003, an 11-month visit in 2015, another in 2019 for what Mother described as "[r]obbery charges," and another in January 2020 for a "warrant violation." The warrant violation appears to have kept Mother in jail for about six months. She was released at the end of July 2020, less than a month before she gave birth to Andrew.

In addition to Mother's 2003, 2015, 2019, and 2020 jail stays, Mother was also convicted of prostitution three times between 2008 and 2009, and for each offense, she served time in jail or received credit for time already served. Plus, the Department's caseworker testified that when she took over the case in November 2021, Mother was in jail again, and Mother remained in jail until October 2022.

Mother thus had a long history of periodic incarceration both before and after her children were born. *See In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *7 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.). ("Even criminal conduct before the child is born is relevant in evaluating the appropriateness of a parent's choices and lifestyle."). And "a parent who is in and out of prison cannot provide a stable life for h[er] children." *In re A.M*, No. 02-19-00023-CV, 2019 WL 3334420, at *16 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.) (reviewing best-interest finding and affirming termination); *see In re J.B.*, No. 02-22-00384-CV, 2023 WL 1859766, at *9 (Tex. App.—Fort Worth Feb. 9, 2023, pet. denied) (mem. op.) (recognizing in analysis of endangerment predicate ground that "[r]outinely subjecting a child to the probability that he will be left alone because his parent is in jail is endangering").

Nor did Mother use her time out of jail to establish the stabilizing environment her children needed. According to Mother's caseworker, Mother lacked a home of her own and had been staying with a friend for the six months between her release from jail and the reconvened termination trial. Although Mother's service plan required her

13

to provide the Department with her address, Mother did not disclose her address, nor did she identify who she was staying with or whether the home could accommodate her children. Mother also failed to provide the Department with proof of employment—despite the court-ordered service plan requiring such proof—so there was no indication that Mother could provide financially for her children.

Considering that Mother did not identify where she was living or whether she had a job, it is unsurprising that she also failed to identify her plans for the children. *See Holley*, 544 S.W.2d at 371–72 (listing "the plans for the child" as best-interest factor); *L.T.*, 2022 WL 15053329, at *7 (affirming best-interest finding and noting that mother's plans were unclear); *In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at *9 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.) (similar, noting that "[m]other did not put on any evidence of her plans").

Even on appeal, Mother's only suggested plan for the children is that they be placed with Grandfather, and she dedicates a significant portion of her brief to this proposition.[11] But Grandfather sought to be appointed as conservator only for Abigail, not for Andrew. Plus, there was evidence that Grandfather had failed to protect Abigail

---

[11]At one point, Mother mailed the trial court a handwritten letter indicating that, if the trial court declined to return the children to Mother's "sole management and motherhood," she would "allow [Grandfather] conservatorship . . . , but only if he t[ook] both [children]."

14

from Grandmother's drug use,[12] and when the trial court asked Grandfather to provide assurances that he would keep Grandmother away from his home if Abigail were placed with him in the future, Grandfather declined to commit.[13]

Regardless, the possibility of Grandfather's conservatorship of the children says nothing about the trial court's decision to terminate Mother's parental rights. Although Grandfather was eager to care for Abigail, there was no evidence that he had agreed to provide such care on Mother's behalf. *Cf. H.R.M.*, 209 S.W.3d at 110 (discussing incarceration-related predicate ground; addressing "whether the incarcerated parent w[ould] be unable to care for the child"; and noting that, "[a]bsent evidence that the non-incarcerated [caregiver] agreed to care for the child on behalf of the incarcerated parent, merely leaving a child with a non-incarcerated [caregiver would] not constitute the ability to provide care").

---

[12]Grandfather admitted that he had been alerted to Grandmother's cocaine use when Abigail was less than one year old, but he claimed that he confronted Grandmother about it and told her she could not use drugs around Abigail.

[13]By the time of the termination trial, Grandmother and Grandfather had divorced. But both times the caseworker had visited Grandfather's home after the divorce, Grandmother had been present. Grandfather claimed that this was just a coincidence. And although Grandfather expressed a desire to protect Abigail, he testified that he loved Grandmother, that they had been together for 42 years, that Grandmother needed to come to his house to "do the treatments" for her COPD, and that "it would be hard to just dismiss her."

The Department's proposed placements, meanwhile, offered the stability that Mother lacked. The Department planned to place Andrew with his great aunt and to place Abigail with a previous foster family that was interested in adopting her.

Given that the children's "need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination," *M.S.*, 2021 WL 2654143, at *19, Mother's instability weighed in favor of the trial court's findings that termination was in the children's best interest.

### 3. The children's needs

This same evidence—Mother's drug use, periodic incarceration, and lack of verifiable housing or employment—also demonstrated that Mother lacked the ability or willingness to provide for her children's needs. *See Holley*, 544 S.W.2d at 371–72 (listing "the emotional and physical needs of the child now and in the future" as best-interest factor).

"[A] child needs . . . ['] parents who d[o] not use drugs,'" *In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) (quoting *In re M.J.*, No. 02-23-00026-CV, 2023 WL 3643673, at *11 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.)), and as already discussed, there was ample evidence of Mother's consistent drug use. "[T]he trial court could have inferred that Mother's drug problems were going to continue and that, because Mother had a continuing pattern of drug abuse, she did not have the ability to meet [the children's] current and future physical and emotional needs." *Id.*; *see In re N.H.*, No. 02-

16

22-00157-CV, 2022 WL 4374638, at *13 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.) (similar).

Plus, again, Mother's pattern of incarceration raised questions regarding her ability to physically address her children's needs. *See J.B.*, 2018 WL 3289612, at *7 (holding evidence of father's "extensive" criminal history was "directly relevant both to his absence from [the child's] life and to his failure to financially and emotionally support him"). And even when Mother was not in jail, there was no indication that she had housing or the financial means necessary to provide her children with basic food or shelter.

Mother's inability to meet her children's needs was particularly concerning given Andrew's health issues. Andrew had trouble eating and, at the time of trial, he still "ha[d] a G-tube."[14] He was in a "primary needs medical home" where, according to the caseworker, the "foster parents [we]re specialized and trained to care for [the] medical needed children." Upon termination, the Department planned to place Andrew with his paternal great-aunt, who had expressed a desire to care for him, and who was a registered nurse with the training necessary to address his medical needs.

Given the evidence of Mother's inability to provide for her children's needs, the trial court was entitled to weigh this consideration in favor of termination.

---

[14]The purpose, meaning, and logistics of the "G-tube" were not discussed in detail at trial.

### 4. Mother's parental abilities and improper parent–child relationship

There was also evidence that Mother had demonstrated an inability to parent. *See Holley*, 544 S.W.2d at 371–72 (listing as best-interest factors "the parental abilities" and the parent's actions "indicat[ing] that the existing parent–child relationship is not a proper one").

Mother "abandon[ed]" Abigail when Abigail was just three days old. And even during the termination case, when Mother's parental rights were at risk, Mother failed to put forth the effort to be there for her children. In the entire three-year period that the case was pending, Mother attended only a handful of visitations. While this was partially due to her periodic incarceration, she was released from jail at least six months before the reconvened termination trial, yet she attended only four of her scheduled visitations in that time. And according to the caseworker, at one of those four visitations, Mother "appear[ed to be] under the influence of a substance." Her continued drug use "reflected a dysfunctional parent–child relationship because Mother could not or would not maintain the sobriety necessary to provide for her [c]hildren's . . . needs." *L.T.*, 2022 WL 15053329, at *8.

Then, despite the trial court's extended recess to allow Mother to attend the termination trial, Mother did not show up. *See In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *9–10 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) (affirming best-interest finding and noting that mother did not appear at trial).

Furthermore, Mother herself acknowledges that she "ha[s] not been a significant factor in either of her children's lives." And given Mother's continued drug use and her failure to (soberly) attend visitation or trial, Mother's actions conveyed the message that she was not interested in becoming a significant factor in her children's lives. *See id.* (affirming best-interest finding when mother continued to use drugs, had very little contact with her son, and did not appear at trial, and commenting that the "[m]other's actions speak clearly: she has no intention of parenting [her son]").

This factor supports the trial court's findings that termination was in the children's best interest.

### 5. Mother's use of programs

The evidence also demonstrates that Mother failed to take advantage of the programs available to assist her. *See Holley*, 544 S.W.2d at 371–72 (listing "the programs available to assist th[o]se individuals" seeking custody as best-interest factor). Although Mother participated in a drug treatment program early in the case, she was subsequently rearrested and resumed using drugs. At that point, Mother stopped participating in the Department-facilitated services, despite a court order directing her to complete those services, and despite the prospect of losing her parental rights if she failed to comply.

Mother's failure to take advantage of the available programs supports the trial court's best-interest findings.

### 6. Mother's excuses

Finally, Mother provided no excuse for her actions. *See id.* (listing "any excuse for the acts or omissions of the parent" as best-interest factor). She gave no explanation for her absence in her children's lives and her failure to appear at trial. On appeal, the only excuse Mother provides is that, though she was unfit, she "made adequate arrangements" for Abigail's care by leaving her with Grandmother and Grandfather and, later, by not contesting Grandmother's conservatorship of Abigail. But as it turned out, Grandmother was also using drugs. Plus, from Grandfather's description of events, Grandmother and Grandfather did not agree to care for Abigail on Mother's behalf; rather, Mother "abandoned" the baby when she left her with them. *Cf. H.R.M.*, 209 S.W.3d at 110 (discussing termination predicate ground that "looks at whether the incarcerated parent will be unable to care for the child" and noting that a nonincarcerated parent's provision of care does not necessarily constitute an implied agreement to assume the incarcerated parent's obligation to care for the child or to provide care on the incarcerated parent's behalf).

Either way, Mother's acknowledgement that she was unfit, though laudably candid, merely confirms that termination was in Abigail's and Andrew's best interest.

### D. Holding

This record provides a significant amount of evidence showing that Mother could not provide a safe environment for her children, that she lacked stability or plans for the children, that she had not and could not provide for the children's needs, that

she had failed to foster a parent–child relationship with them, and that she failed to take advantage of the programs available to assist her. Based on our exacting review of the entire record and weighing all of the disputed evidence, *A.C.*, 560 S.W.3d at 631, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination was in Abigail's and Andrew's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule this issue.

## III. Evidentiary Objection

Mother's final appellate issue challenges the trial court's admission of three misdemeanor judgments of conviction for prostitution. We review the admission of such evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *J.B.*, 2018 WL 3289612, at *6.

Mother claims that the trial court abused its discretion by admitting the misdemeanor judgments because they were irrelevant[15]—the convictions were more than a decade old and, according to Mother, they were not shown to be part of a pattern of behavior that continued to impact the children.[16] As our exacting review of the best-

---

[15]Mother's brief also references Rules of Evidence 403 and 609, but Mother did not raise either Rule at trial, so those complaints have not been preserved for appeal. *See* Tex. R. App. P. 33.1(a).

[16]Mother appears to acknowledge that, if the misdemeanor judgments had been part of a broader pattern of behavior—for example, if they had been for drug offenses rather than prostitution offenses—they would have been relevant. But to the extent that she contends the age of the convictions alone rendered them irrelevant, we

interest issue has demonstrated, though, the three objected-to judgments were indeed part of a pattern of behavior and were directly relevant to the best-interest determination.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if the fact "is of consequence in determining the action." Tex. R. Evid. 401. The misdemeanor judgments, then, were relevant if they made it more or less likely that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re J.R.*, No. 02-15-00394-CV, 2016 WL 1267937, at *6 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.).

A parent's criminal history is "directly relevant to the best-interest determination." *J.B.*, 2018 WL 3289612, at *7 (rejecting challenge to criminal history as irrelevant in termination case); *see In re S.B.*, 207 S.W.3d 877, 888 (Tex. App.—Fort Worth 2006, no pet.) (noting that "[a] trial court may consider incarceration as a best-interest factor"). A pattern of lawbreaking and confinement—no matter the charge—makes it less likely that the parent can provide a stable, permanent home, *see A.O.*, 2022 WL 1257384, at *15, and stability is in a child's best interest, *see M.S.*, 2021 WL 2654143, at *19.

---

disagree. *Cf. Murray v. Tex. Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 367–70 (Tex. App.—Austin 2009, no pet.) (rejecting argument "that [the fact that] several of the [parent's] convictions were more than ten years old render[ed] the evidence more prejudicial than probative").

Here, Mother had been "in and out of jail" for various offenses both before and after her children were born. There was evidence that Mother's periodic incarceration contributed to her absence in Abigail's life and jeopardized her ability to provide a stable home for her children, including her provision of physical or financial support. *See J.B.*, 2018 WL 3289612, at *7 (holding evidence of father's "extensive" criminal history was "directly relevant both to his absence from [the child's] life and to his failure to financially and emotionally support him"). The Department's investigator, the caseworker, and Mother's medical records all discussed this pattern of behavior, and the three objected-to judgments were further evidence of it. In fact, when Mother's counsel lodged her objection to the judgments, Mother was then in jail, and the trial court confirmed as much before overruling the objection.

So even though the misdemeanor convictions were relatively old, they evidenced a pattern of behavior that made it less likely that Mother could address her children's needs or provide them with a stable home, which in turn made it more likely that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); Tex. R. Evid. 401. The judgments were thus relevant to the best-interest determination, and the trial court did not err by admitting them into evidence.[17]

---

[17]Even if the admission of the judgments had been erroneous, the error would have been harmless. Mother claims the judgments' admission was harmful because the judgments were the only evidence of Mother's alleged criminal history. But as has been shown, the judgments were far from the only evidence of Mother's criminal history. And the judgments were not the only evidence of Mother's involvement in prostitution either. In addition to the investigator's testimony that Mother's criminal history

We overrule this issue.

## IV. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.
*See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: August 31, 2023

---

included "several prostitution charges," Mother's medical records noted that she had slept with ">200 lifetime partners" due to a "hx of prostitution." Because Mother has not enunciated any allegedly prejudicial component of the judgments that was not duplicated by other evidence not challenged on appeal, the admission of the judgments, even if erroneous, would have been harmless. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) ("The general rule is [that] error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection."); *In re C.T.*, No. 13-12-00006-CV, 2012 WL 6738266, at *18 (Tex. App.—Corpus Christi–Edinburg Dec. 27, 2012, no pet.) (mem. op.) (applying rule in termination case).