# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00461-CV

---

### W. B., Appellant

#### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 321796, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant W.B. (Father) appeals from the district court's final order, following a de novo hearing, terminating his parental rights to his two-year-old son, A.W. (Charlie).[1] In four issues on appeal, Father contends that (1) this Court cannot presume that the record of the hearing before the associate judge, which preceded the de novo hearing but has not been included in the appellate record, supports the decision terminating his parental rights; (2) the evidence is legally and factually insufficient to prove that Father placed Charlie in an endangering environment; (3) the evidence is legally and factually insufficient to prove that Father engaged in endangering conduct; and (4) the evidence is legally and factually insufficient to prove that termination of Father's parental rights was in Charlie's best interest. We will affirm the order terminating Father's parental rights.

---

[1] For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other, and we refer to the child's approximate age at the time of trial. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

The case began in late December 2020, when the Texas Department of Family and Protective Services (the Department) received a report alleging neglectful supervision of Charlie by Charlie's mother, K.W. (Mother), and Father. In the Department's removal affidavit, a copy of which was admitted into evidence at the de novo hearing, CPS investigator Catina Bett averred that Mother had given birth to Charlie following the relinquishment of her parental rights to three other children, "Tammy," "Zachary," and "Lisa" (all pseudonyms), who had been removed from her care after Lisa had been born with marijuana in her system and after Mother had attempted to commit suicide. The Department also expressed concerns about Father, who was in a relationship with Mother but who was not the biological father of her other children. According to Bett, Father had picked up Mother's children from school while he was smoking marijuana.

The Department also received a report alleging "sexual abuse of all the children" by Father. Zachary had exhibited behaviors "indicative of sexual abuse," including "attempt[ing] to put his mouth on another child's penis." The Department was concerned that "without legal intervention, [Mother] will allow [Father] to have contact with [Charlie], placing the child in a dangerous situation that can affect his wellbeing and life," that Mother "was not able to provide a safe environment for the child as she continues to engage in sexual intercourse and be in a relationship with [Father,] who sexually abused her children," and that Mother "relinquished her rights to her other children and failed to disclose her involvement with the Department to the hospital to allow [Father] to have ongoing access to [Charlie]." Based on these concerns, the Department sought and obtained emergency removal of Charlie from Mother's and Father's care and filed a petition to terminate their parental rights to Charlie.

In January 2021, while the case was ongoing, Father was indicted on three counts of aggravated sexual assault of a child, Tammy, who was six or seven years old at the time of the alleged offenses. The indictment, a copy of which was admitted into evidence at the de novo hearing, alleged that Father intentionally and knowingly caused the penetration of Tammy's mouth with his sexual organ, intentionally and knowingly caused the penetration of Tammy's sexual organ with his finger, and intentionally and knowingly caused the penetration of Tammy's anus with his sexual organ. In the probable-cause affidavit for Father's arrest, a copy of which was admitted into evidence at the de novo hearing, the arresting officer averred the following:

> I WOULD ADVISE THAT ON JULY 9, 2020, A CPS WORKER REPORTED AT THE KILLEEN POLICE DEPARTMENT THAT AN ALLEGATION OF AGGRAVATED SEXUAL ASSAULT OF A CHILD HAD SURFACED DURING HER INVESTIGATION. I WAS ASSIGNED THE CASE. I WOULD ADVISE THAT I REVIEWED THE VIDEO FROM WHEN THE VICTIM, [TAMMY,] WAS INTERVIEWED BY A FORENSIC INTERVIEWER AT THE CHILDREN'S ADVOCACY CENTER [CAC] IN TEMPLE, TEXAS, AND REPORTED THAT SHE HAD SEXUAL CONTACT WITH THE SUSPECT [FATHER] AND THAT THE LOCATION OF THE ASSAULT WAS THE SUSPECT'S HOUSE IN KILLEEN, BELL COUNTY, TEXAS WHEN SHE WOULD VISIT WITH HER MOTHER. THE ASSAULTS OCCURRED MULTIPLE TIMES DURING THE TIMEFRAME OF JUNE 2019 THROUGH JULY 2020. I WOULD ADVISE THAT THE VICTIM FURTHER REPORTED THAT SHE WAS 6 AND 7 YEARS OF AGE AT THE TIME OF THE ASSAULTS . . . .

In December 2021, Charlie's foster parents filed a petition to intervene in the termination suit, seeking to adopt Charlie if Mother's and Father's parental rights were terminated. A second couple, who had adopted Mother's other children in November 2021, also filed a petition in intervention seeking to adopt Charlie. Meanwhile, Mother executed an affidavit of relinquishment of her parental rights to Charlie. Father opposed the termination of his parental rights.

3

The case proceeded to a four-day bench trial before an associate judge, after which the associate judge signed a decree terminating Mother's and Father's parental rights to Charlie, naming the Department as Charlie's managing conservator, and continuing Charlie's current placement with the foster parents. Regarding termination, the associate judge found that Mother had executed an irrevocable affidavit of relinquishment of her parental rights, *see* Tex. Fam. Code § 161.001(b)(1)(K), and that Father had endangered Charlie's physical and emotional well-being, *see id*. § 161.001(b)(1)(D), (E). The associate judge further found that termination of Mother's and Father's parental rights was in Charlie's best interest. *See id*. § 161.001(b)(2).

Father filed a request for a de novo hearing on the issues of termination and placement. At that hearing, several witnesses testified, including the Department caseworkers assigned to the case, two of Charlie's guardians ad litem, Father, Foster Mother, one of the adoptive parents of Charlie's three siblings, the case manager for the adoption agency that licensed the siblings' adoptive parents, and a child psychologist. Exhibits admitted into evidence at the de novo hearing included the removal affidavit, Father's family service plan, the final permanency report, documents related to Father's pending criminal charges, Mother's affidavit of relinquishment, and a recording of Tammy's forensic interview with the CAC. At the hearing's conclusion, the district court announced that it could not conclude that the associate judge was incorrect in its ruling or that there was insufficient evidence to support its findings, and it adopted the associate judge's order as its own. The district court subsequently signed its final order "affirm[ing] the ruling of the associate judge." This appeal followed.

4

## DISCUSSION

### "Absent record" presumption

Contemporaneous with the filing of his notice of appeal, Father filed a request for preparation of the clerk's record and reporter's record, including "[a] full transcript of the final hearing conducted" before the associate judge. However, the district court provided only the transcript of the de novo hearing.[2]

In his first issue, Father asserts that this Court "should limit its [sufficiency] review to the de novo hearing in the district court and disregard the final hearing" held before the associate judge by not indulging the "absent record" presumption. *See In re G.X.H.*, 627 S.W.3d 288, 300 (Tex. 2021) ("In the absence of a record, we presume the evidence was sufficient to support the trial court's findings."). Father contends that "[i]ndulging the absent-record presumption in this case would violate [his] constitutional right to meaningful review." He argues that because he is indigent, he is entitled upon request to have the county pay for the transcript of the hearing before the associate judge. In Father's view, because he requested the transcript but the district court refused to pay for it, "hold[ing] the absence of that part of the record against [Father] by indulging the absent-record presumption . . . . would impose an unreasonable impediment to [Father's] appellate rights, and thereby violate due process."[3]

---

[2] In an email from the court reporter to Father's counsel that Father attached to his brief but is not included in the clerk's record, the court reporter wrote, "Judge Jones has let me know that he is not going to approve payment for the Final Hearing held before Judge Sims [the associate judge] on this appeal, and you'll only have the De Novo record to appeal." No further explanation was provided in the email. The record contains no response from Father's counsel to this email, and the clerk's record does not include any documents either denying counsel's request for the transcript or explaining the court's reasoning for not providing it.

[3] We note that the Department in its brief does not address the merits of this issue but asserts instead that Father inadequately briefed it. We disagree. Father presented a "clear and

Father acknowledges that "[t]his Court can, however, avoid this constitutional issue by declining to consider the hearing [before the associate judge] or indulge any presumptions about what may or may not have been presented there." Thus, Father asks this Court to "either disregard any evidence that may have been presented at the final hearing [before the associate judge] or else remand to the trial court for supplementation of the record."

For purposes of this appeal, we will assume without deciding that it is not appropriate to indulge the absent-record presumption here. *See* Tex. R. App. P. 47.1; *see also In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) (explaining that courts are to avoid deciding constitutional questions when possible); *T.L. v. Cook Child.'s Med. Ctr.*, 607 S.W.3d 9, 35 (Tex. App.—Fort Worth 2020, pet. denied) (explaining that principle of judicial restraint requires courts to refrain from deciding constitutional issues "unless it is necessary to do so"). Accordingly, we sustain Father's first issue to the extent that we will limit our sufficiency review to the evidence presented at the de novo hearing.

**Evidentiary sufficiency**

In his second and third issues, Father asserts that the evidence is legally and factually insufficient to prove that he endangered Charlie. In his fourth issue, Father asserts that the evidence is legally and factually insufficient to prove that termination of his parental rights is in Charlie's best interest.

---

concise argument" for this contention, "with appropriate citations to authorities and to the record." *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see also Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 427 (Tex. 2004) (explaining that appellate rules are to be construed reasonably yet liberally to avoid briefing waiver when possible).

*Standard of review*

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re A.C.*, 560 S.W.3d at 630 (quoting Tex.

7

Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

### Evidence presented

Department caseworker Melissa Macias was assigned to the case at the time of the hearing before the associate judge. She was the fourth caseworker assigned to the case and had been the caseworker for approximately four to five months. Macias testified that when the Department took custody of Charlie, the Department's concern for Charlie's safety was based on "the outcry of sexual abuse" made against Father by Charlie's older siblings, combined with the fact that Mother and Father "were still together residing in the same household" when Charlie was born.

Father's family plan of service included parenting classes, a psychological evaluation, individual counseling, and random drug tests on a weekly basis. Macias believed that Father "may have been working services" before her involvement with the case but that when she received the case, Father "was no longer working services," including drug testing. Macias also testified that when she received the case, Father never allowed her to visit his home and that she "was never able to assess [the] safety" of Father as a placement. She tried to engage with Father through "a combination of calls, text messages, unannounced visits to the home, announced visits to the home," and even a letter that was mailed to his address. Although Father responded to one text message and Macias spoke to him on one occasion, Father "was unwilling to meet with" Macias.

Regarding the allegations of sexual abuse against Father, Macias acknowledged that the allegations had been made by one of Charlie's siblings and that the criminal case was still pending. However, she testified that the outcry had never changed, and "[t]hat's concerning because if [Charlie] were to be placed in the same home, that could potentially happen to him as well." Father had no visitation with Charlie because of the pending sexual-assault charges.

9

Macias testified that at the time of the hearing before the associate judge, the Department was recommending termination of Father's parental rights because Father "wasn't involved in any of his services," Father "wasn't making contact with the Department," and Charlie had "a very strong bond with his current foster family," who was "willing to adopt him."

Macias had visited Charlie at the foster parents' home "at least once a month" and "[s]omewhere between four and seven" times. Macias testified that Charlie "has an incredibly strong bond with the [foster] family, including their biological children," who Charlie considered to be "his brothers and sisters." She described their home as "very, very loving" and "safe," with "appropriate play equipment for the children." Macias had no concerns about the foster placement. She explained, "They're engaged all of the time that I'm there. They are able to meet all of his needs as well as their own biological children's needs as well." Additionally, Charlie had been placed with the foster family since the case began, when he was either four or five days old. At the time of the de novo hearing, Charlie had been in the foster placement for over two years. Macias further testified that when Charlie visited the home of his biological siblings, he was "hesitant" to engage with them and their adoptive parents, who were "kind" but "also a little hesitant" to engage with Charlie.

Department caseworker Kirby Rubin, the current caseworker assigned to the case, testified briefly that the Department's policy was to try to keep siblings together but that this was not always possible. He testified that he had not visited and was not familiar with the adoptive parents of the siblings.

Michael Lockett, the previous guardian ad litem for Charlie at the time of the hearing before the associate judge, testified that his recommendation at the time of that hearing was that Mother's parental rights be terminated because of the relinquishment, that Father's

10

parental rights be terminated because of the outcry of sexual abuse and Tammy's CAC interview, and that Charlie remain with the foster parents because "that's the only home that he's known." Lockett had visited the foster home "half a dozen or so" times, and during those visits, Charlie appeared to be bonded with the foster parents. Lockett had also observed a visit between Charlie and his biological siblings, and he described this visit as "awkward. Not necessarily because anybody made it awkward, but just awkward given the reality of the case and what's going on." Although Lockett had earlier in the case recommended that Charlie be placed with his siblings, that recommendation changed "the longer the case went on" and Charlie became "more and more bonded to his current placement."

Lockett testified that there was "no doubt" in his mind that Father's parental rights should be terminated. When asked why he had no doubt, Lockett explained, "I watched the outcry of [Tammy], and I watched it twice. And I believe what she was saying. And I believed the abuse that she suffered. And I think that would make it dangerous for [Charlie] to be with his dad." Nothing had happened during the case that would change Lockett's mind about terminating Father's parental rights.

Melat Mekonnen, Charlie's current guardian ad litem, testified that she recommended termination of Father's parental rights and that Charlie remain in his current placement. She had visited the placement twice and had witnessed a close bond between Charlie and the foster parents' biological children. It was a happy home, suitable for children, and the foster parents were "the only parents that he knows." She believed that "any placement change for [Charlie] would cause a detriment to his emotional health" because "[h]e's been in the home since he's been five days old."

Father testified that he was engaged to Mother, they still lived together, and there had never been a time when they were separated. Father explained that he had three jobs since 2021: he worked part-time at a food care center, cut lawns, and chopped wood. Father further testified that he had completed his services, including a psychological evaluation, individual counseling, and drug testing, although he could not recall the last time that he had taken a drug test for the Department. Father acknowledged that he had not communicated with Department caseworkers Macias and Rubin. He claimed this was because they had "terminated" his services after he had completed them.

Father recounted that he had engaged in individual therapy for "[r]oughly eight, nine months" and that he had been successfully discharged from therapy. Father testified that he had completed therapy because he wanted to be reunited with Charlie, who he had not seen in person since Charlie's removal in December 2020. If Father could not have custody of Charlie, he preferred that he be placed with Charlie's siblings because Father was "once in CPS" and his "brother and sister were tor[n] apart," so he did not want something similar to happen to Charlie.

Father acknowledged that his criminal case was "still ongoing" at the time of the de novo hearing and testified, "I have to plead the Fifth on that, because it hasn't—nothing's progressed yet, and I have no answers for that yet. So I'd like to just plead my Fifth on that. No further questions." Father also testified that he had "no idea" as to the nature of the specific allegations against him, although he knew that he was being charged with aggravated sexual assault. Father called Tammy's allegations "false" and invoked the Fifth Amendment in response to specific questions regarding whether he had vaginally penetrated her, anally penetrated her, and orally penetrated her. Regarding a separate outcry by Zachary that Father

12

had put him "in an uncomfortable position," Father testified, "I haven't seen the child for so many years, and anything he could have [] said in the investigator room, I have no idea."

Foster Mother testified that she had four other children in her home in addition to Charlie, ages twelve, ten, five, and one-and-a-half. They live in a five-bedroom house, and Charlie has his own bedroom. Foster Mother works at home, raising the children. Her husband works "in tech" for IBM, and he is Charlie's "favorite person in the universe." Foster Mother testified that Charlie is also "super attached" to her other children and described in detail their interactions playing together. Foster Mother homeschools her older children and had already started to educate Charlie with flash cards, sounds, shapes, and colors. Regarding their socialization of Charlie, Foster Mother testified that they had "an amazing neighborhood" where the children were all close and that Charlie had "little buddies in Sunday School" at their church. The foster parents also initiated visits with Charlie's siblings. Foster Mother testified that they have "never missed an opportunity of trying to get those kids together" and that the visits "go really well in general." Foster Mother added that if they adopted Charlie, they intended to continue the sibling visits.

"James" (a pseudonym), one of the adoptive parents of Charlie's three siblings, testified that he and his husband had five children, the three siblings that had been removed from Mother and two others. James explained that the three siblings originally had been placed with another family but were removed from that home after allegations of abuse arose. They were then placed with James and his husband. After they learned that Charlie was available for placement, they expressed a willingness to have him live with them. Charlie was placed with the foster parents instead. James testified that Charlie's visits with his siblings "were fine," although he thought that the foster parents could sometimes be "hovering" and "overbearing" during the

13

visits. James believed that it was important for Charlie to be placed with his siblings and that he and his husband had significant support from their friends and family to help them raise Charlie.

Regarding Tammy's outcry against Father, James testified that the allegations were sexual abuse, specifically penetration, when Tammy was seven years old. He recounted that Tammy was "doing amazing" right now but that she had required "extensive, multiple types of therapy sessions to help with the trauma of sexual abuse." James testified that he had conversations with Tammy about what had happened to her and that he believed what she had told him. She had identified Father as the person who had abused her, and she had never changed her position about what he had done to her. James had never found Tammy to be a liar and had no reason to disbelieve her account of the abuse. James would not trust any of his children to be alone with Father, and he believed it was in Charlie's best interest for Father's parental rights to be terminated.

Stephanie Pino, the case manager for the adoption agency that licensed James and his husband, testified that she had been involved in placing the siblings in their home. According to Pino, James and his husband had never "wavered in their desire for [Charlie] to be in their home" and wanted all four siblings to live together. Pino also testified that there were no safety concerns with their home, that it was suitable for a sixth child in addition to the five they already had, and that they had received extensive training through the agency regarding caregiving for children. Pino had "no concerns whatsoever" that they would be able to meet Charlie's needs.

Dr. Scott Hammel, a child psychologist, testified about childhood attachment and bonding to caregivers. Dr. Hammel briefly observed Charlie with the foster parents but did not evaluate them or anyone else involved in the case. Based on his limited observations, he

14

believed there was "some sort of attachment" between Charlie and the foster parents, although he could not specify the degree of attachment.

### *Endangerment*

Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.,* 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)).

In this case, we will focus our analysis on (E). "Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *Id*.

15

"The conduct to be examined includes what the parents did both before and after the child was born." *Id*. Because "endangering conduct is not limited to actions directed towards the child," it "may include the parent's actions before the child's birth, while the parent had custody of older children . . . ." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Boyd*, 727 S.W.2d at 533). "Sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.); *see also In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied) ("It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being."). Moreover, evidence of abuse committed against one child can support a finding of endangerment against other children who might later discover the abuse or be abused themselves, even if the other children were not yet born at the time of the abuse. *See In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San Antonio 2012, pet. denied); *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied); *see also In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *12 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.) ("[P]redatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered.").

Here, the Department presented evidence that Father sexually assaulted his stepdaughter Tammy vaginally, anally, and orally, when she was six or seven years old. Copies of the probable-cause affidavit, the indictment, and Tammy's CAC interview were all admitted into evidence at the de novo hearing. One of Charlie's guardians ad litem testified that he watched Tammy's interview twice, "believed what she was saying," "believed the abuse that she suffered," and thought that the abuse "would make it dangerous for [Charlie] to be with his dad." One of Tammy's adopted parents, James, testified that he had conversations with Tammy about what had

16

happened to her, that he believed what she had told him, that she had identified Father as the person who had abused her, and that she had never changed her position about what Father had done to her. James had never found Tammy to be a liar, had no reason to disbelieve her account of the abuse, and would not trust any of his children to be alone with Father. Additionally, one of the Department caseworkers testified that Tammy's outcry had never changed and that the outcry was concerning to her "because if [Charlie] were to be placed in the same home, that could potentially happen to him as well."

Father argues that the evidence is insufficient because he testified that the allegations were false, no other witness had "personal knowledge" of the allegations, and although the indictment "sets forth some detail, [] it is merely a pleading and only evidence that allegations were made, not that they were true." However, the district court could have reasonably inferred that the indictment, when combined with the other evidence summarized above, including Tammy's CAC interview, supported a finding that Father had sexually assaulted Tammy as alleged. *See In re K.A.R.*, No. 07-22-00157-CV, 2022 WL 3684643, at *2 (Tex. App.—Amarillo Aug. 25, 2022, pet. denied) (mem. op.) (explaining that although indictments do not establish guilt, they "issue upon a grand jury finding probable cause to believe a crime occurred" and that "[p]robable cause reflects the presence of evidence indicating a fair probability about the occurrence of the act in question"). Moreover, when asked about each specific allegation in the indictment, Father invoked his Fifth Amendment privilege against self-incrimination. In a civil case, a factfinder may draw an adverse inference against a party who invokes the Fifth Amendment. *In re C.J.F.*, 134 S.W.3d 343, 352 (Tex. App.—Amarillo 2003, pet. denied). Thus, the district court as factfinder was permitted to disbelieve Father's claim that the allegations were false and to infer that he committed the offenses against Tammy as alleged and that Charlie was endangered by Father's abusive conduct. *See Murray v. Texas Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 367 (Tex. App.—Austin 2009, no pet.).

17

We conclude that the above evidence is legally and factually sufficient to support the trial court's findings that Father engaged in a voluntary, deliberate, and conscious course of conduct that endangered Charlie's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Because Section 161.001 requires proof of only one statutory predicate ground to support termination, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not consider whether the evidence is sufficient to prove statutory ground (D), *see* Tex. R. App. P. 47.1.

We overrule Father's second and third issues.

### Best interest

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d at 807; *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re*

*B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

In this case, some evidence was contrary to the district court's finding that termination of Father's parental rights was in Charlie's best interest, including evidence that Father loved Charlie, wanted Charlie to have a relationship with his siblings, and had engaged in some court-ordered services in an effort to be reunited with Charlie. However, most of the evidence in the record supports the district court's finding. In addition to the evidence that Father sexually assaulted Charlie's sister, discussed above, there was also evidence presented that Charlie had been placed with his foster parents his entire life, that they loved and intended to adopt him, and that their home was the only home Charlie had ever known; that Charlie was bonded to his foster parents and their biological children and that because of this bond, it would be detrimental to his emotional well-being to remove him from their care; and that the foster parents had strong social support from their family and their community. The Department also presented evidence that Father had refused to allow the Department to assess the safety of his home, to meet with the two most recent caseworkers, and to submit to all the drug tests required by the Department; that Father had no role at all in Charlie's life during the entirety of the case due to the allegations against him; and that Father had an uncertain future because of those allegations, including the possibility of incarceration, if convicted.

Viewing the totality of the above evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Father's parental rights was in the best interest of Charlie. Accordingly, the evidence is legally sufficient to support the best-interest finding. Similarly, we are unable to say that the evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Father's parental rights was in the best interest of Charlie. Accordingly, the evidence is also factually sufficient to support the finding.

We overrule Father's fourth issue.

## CONCLUSION

We affirm the district court's order terminating Father's parental rights.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   November 30, 2023