# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00789-CV

**Christopher Murray, Appellant**

**v.**

**Texas Department of Family & Protective Services, Appellee**

### FROM THE COUNTY COURT AT LAW OF BASTROP COUNTY
### NO. 07-11795, HONORABLE H. R. TOWSLEE, JUDGE PRESIDING

## O P I N I O N

This is an accelerated appeal from an order terminating the parental rights of appellant Christopher Murray to his minor child, N.M., after a jury found that his rights should be terminated. The Department of Family and Protective Services (the "Department") sought to terminate Murray's parental rights to N.M. on the grounds that Murray knowingly placed or knowingly allowed N.M. to remain in conditions or surroundings that endangered her physical or emotional well-being and/or engaged in conduct or knowingly placed N.M. with persons who engaged in conduct which endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E), (F) (West 2008). On appeal, Murray argues that the trial court erred in requiring Murray to assert his privilege against self-incrimination on a question-by-question basis and in admitting certain evidence. Having found no error, we affirm the trial court's judgment.

## BACKGROUND

This case arises out of the death of N.M.'s two-year-old half-brother, R.F., on June 11, 2007.[1] At the termination hearing, the Department introduced evidence regarding (1) the circumstances surrounding R.F.'s death, (2) prior bad acts by Murray, and (3) N.M.'s well-being.

*The Death of R.F.*

At the time of his death, R.F. and then seven-month old N.M. were living with Murray; Victoria Faske, Murray's girlfriend and the mother of N.M. and R.F.; Mary Cabrera, Murray's mother; J.R., Cabrera's then five-year-old-son; and Rosie Cervantes, Murray's maternal grandmother, in Paige, Texas.

On the morning of June 11, Murray was at home alone with N.M and R.F. for approximately three hours. Faske left for work around 7:00 a.m. Cabrera, J.R., and Cervantes left the house around 9:30 a.m. for a shopping trip to Austin. Cabrera and Cervantes both testified that R.F. appeared to be happy and healthy when they left the home that morning. According to Cabrera, R.F. "was happy, he was eating, he was running around." However, when Cabrera and Cervantes returned home approximately three hours later, R.F. was blue in the face, making "gurgling noises," and having difficulty breathing.

Cervantes called 911, but before an ambulance could arrive, Murray took R.F. in his car and drove to the Paige Fire Department for help. But when Murray reached the fire department, rather than stopping for help, he decided to continue on to the hospital. On the way, Murray lost

---

[1] The facts come from the testimony at trial, as well the written reports that were prepared and filed by the Department and the investigative reports that were introduced into evidence at trial.

control of the car and drove off the road and into a ditch.[2] Murray then climbed out of the car, carrying R.F.

Paul Meinke, an assistant supervisor with the Texas Department of Transportation, came upon the scene soon after the accident. Meinke saw Murray kneeling down in the ditch, and as Meinke walked toward Murray, he noticed R.F. lying on the ground beneath Murray. Meinke testified that R.F. looked "[p]ale, he was covered part of the way with his shirt, his lips were blue, [he] had a blue knot on his forehead, and he was just laying in the grass there." While waiting for paramedics to arrive, Meinke observed Murray on the phone and overheard Murray say "that him and the child had been watching Spiderman, and that he had fell, and he was vomiting and passed out, but a few minutes later he was up and playing and seemed okay." Meinke also noted that Murray would periodically yell, "Where is the help?" Meinke testified that, although Murray was "hollering," he did not show much emotion.

When the ambulance arrived, the workers did not perform CPR or any other treatment on R.F.; rather, R.F. was pronounced dead at the scene.

Joel Wade of the Bastrop County Sheriff's Department headed up the sheriff department's investigation into R.F.'s death. Wade interviewed Murray at the accident scene and asked him about R.F.'s injuries. Murray told Wade that R.F. injured himself—specifically, his upper left temple—when he fell off a computer chair and onto the floor. According to Murray, R.F. was still functioning normally after the fall: R.F. climbed up onto Murray's bed, ate a few grapes and

---

[2] Joel Wade, an investigator with the Bastrop County Sheriff's Department, testified that the car was not damaged and that, to the best of his knowledge, Murray was not injured in the accident.

a popsicle, drank some juice, and watched a movie with Murray. Murray also speculated that R.F.'s fatal injuries were the result of getting jarred when the car skidded off the road.

Murray was arrested at the scene of the accident. That evening, from jail, he placed several phone calls to his grandmother's home. The phone calls were recorded and portions of the phone calls were played for the jury at the termination hearing.[3] In the first call that was played for the jury, Murray repeatedly asked Cervantes to bail him out that evening. When Cervantes told him that she did not have the money to bail him out, Murray became angry with her and demanded to speak with his mother. When Cabrera got on the line, she promised to "call the judge in the morning," and Murray responded angrily, "It ain't going to do no good in the morning." As Cabrera explained that the rest of the family was gone—N.M. and J.R. had been removed from the home by the Department and Faske had not come home—Murray continued to ask them to bail him out that night, suggesting that it might be his last night to spend with them. In the second phone call, Murray discussed R.F.'s injuries with Cabrera:

| Murray: | Ok, they ain't done the autopsy yet, so how in the hell are they saying that? |
| Carbera: | They're just going by the bruises. I guess he was examined . . .[inaudible]. |
| Murray: | No, I hurt the little boy. I hurt him where he couldn't sound like he had fluid in his lungs. |

---

[3] Murray objected to the introduction of the phone calls on the grounds that the calls were not relevant to the proceedings and were overly prejudicial. *See* Tex. R. Evid. 402, 403. Murray did not raise any other grounds for objection to their admittance. The trial court overruled his objections.

| | |
|---|---|
| Cabrera: | No, Chris. That's cause he was bleeding. Remember when [inaudible] was bleeding from his head? He was gurgling. He was gurgling—he was choking on his blood. |
| Murray: | He wasn't doing that—I mean—he was—I was—like two hours—three hours later, Mom. |
| Cabrera: | Well, Chris, I don't know. Maybe something happened to his head before, that's why he was holding it and then this—this blow did it. I don't know, Chris. I don't know. |

But in the next phone call with his grandmother, Murray proclaimed his innocence to Cervantes, saying, "Nana, he fell out of the chair." Murray then again pleaded with his grandmother to bail him out of jail that night. When Cervantes refused, the following exchange took place:

| | |
|---|---|
| Murray: | So you think I done it, huh? |
| Cervantes: | I do. I do. I do. Yep. Yep. |
| Murray: | That's real nice of you. Thank you. |
| Cervantes: | Look, he was doing real good this morning. He ate— |
| Murray: | [Shouting] Yes, he was doing real good and, after he fell, three hours later he was doing real good. |
| Cervantes: | Well, I don't know, Chris. I don't know what's going to happen to you. Ok. I told you one day—didn't I tell you—I told you and you don't listen. I don't know what's wrong with your head. There's something wrong with you. Okay? And I'm scared. I'm scared of letting you out. I'm scared of you. |

The conversation then turned, once again, into an argument about Cervantes's refusal to borrow the money necessary to bail Murray out of jail.

Murray:        I can't believe you're going to give up on me that easy.

Cervantes:     I can't believe what you did.

Murray:        I didn't do nothing!  Look, I told y'all to take him because he runs up and down.  I had [N.M.].  She fussed all damn day long.  I put her down, trying to take care of him—I've got to fix her bottles.  [Shouting] Look, y'all didn't want to help me out!

Cervantes:     Your mother didn't want to—

Murray:        [Shouting] I asked y'all to take [R.F.][4]

A few days later, Murray requested to speak with Lisa Jackson, a victim services coordinator for the Bastrop County Sheriff's Department.  This conversation was video recorded and a DVD of the interview was admitted into evidence.[5]  Murray told Jackson about R.F.'s purported fall from the computer chair.  Murray said that he was in the bedroom with N.M. when he heard R.F. crying from the adjoining playroom.  Murray stated, "I went in there and he was picking himself up.  He was crying and I picked him up.  I said where's your owie.  And he shook his head no, he shook his head no."  According to Murray, he checked R.F. for swelling or a "knot" on the head and found none.  Murray said he continued to monitor R.F. closely and "he seemed fine"—R.F. climbed up on Murray and Faske's bed, ate a snack, drank some juice, and watched a movie with Murray.  Murray also suggested other causes of R.F.'s injuries besides the fall from the chair, saying that R.F.

---

[4]  The Department also introduced a phone call from Murray to Cabrera, in which Murray threatened to hang himself when he returned to his cell, and a call from Cabrera to the sheriff's department, in which she asked them to place Murray on suicide watch.  The sheriff's department's victim services coordinator, Lisa Jackson, testified that Murray was indeed placed on a suicide watch.

[5]  Murray did not object to the admission of the video-taped interview.

had fallen out of a tree a few days prior to his death and that five-year-old J.R. was very rough with R.F.[6]

The autopsy results for R.F. belied the benign explanations that Murray gave Wade, his grandmother, and Jackson for R.F.'s fatal injuries. Travis County Chief Medical Examiner, Dr. David Dolinak, who conducted R.F.'s autopsy, testified that R.F.'s injuries were the result of non-accidental, blunt-force trauma and were consistent with child abuse. According to Dolinak, R.F. had "at least 120 bruises on his body. There were at least 46 bruises on his head. There were at least 20 bruises of his abdomen, 24 bruises of his chest, and 30 bruises of his extremities." R.F. had a severely fractured skull—"it started down at the base of the skull and worked up the back left side of his head"—a fracture in one of his neck bones, and four broken ribs. R.F. also had lacerations of his liver and intestines. According to Dolinak, it would take "a lot more force" than falling two or three feet from a chair to sustain those injuries and that R.F. would not have been able to climb up on the bed or eat and talk after sustaining the injuries. He further testified that the injuries were not consistent with having fallen from a tree a few days earlier and that, while R.F. had a few healing injuries that were a week or more old, most of R.F.'s injuries occurred within a few hours of his death:

> The majority—the vast majority of these injuries show no sign of healing, so his death would have come fairly soon after they were sustained. In particular, the injuries—or the blood around his brain and the scalp around the fracture didn't show any sign of healing. Plus, the severity of the injury of his head would have produced pretty severe symptoms and death fairly quickly.

---

[6] Cervantes testified that, a few days prior to R.F.'s death, she noticed a large bruise on his left cheek and was told that the bruise was the result of a fall from a tree that had purportedly happened while R.F. was in Murray's and Cabrera's care.

7

The Department called Murray as a witness and questioned him about the events of June 11. Murray responded to each question by invoking his Fifth Amendment privilege against self-incrimination.

*Murray's Prior Bad Acts*

In addition to the evidence regarding Murray's role in R.F.'s death, the Department introduced evidence of angry outbursts and past criminal activity by Murray. Faske testified that Murray had an explosive temper. She recounted an incident when Murray left both of her arms bruised after grabbing her and trying to yank her purse away from her. According to Faske, Murray threatened that, if she ever left him, "he would find me and he would take my kids from me." In addition, Faske told Wade that Murray would sometimes "blow up" at his mother and grandmother. The Department also introduced evidence of Murray's prior convictions—for criminal mischief in 2002, possession of marihuana in 1998 and 1997, and three counts of burglary of a vehicle in 1996.[7]

*N.M.'s Well-Being*

The Department removed N.M. from the home on the day of R.F.'s death and placed her with Cheryl Thompson, her maternal great aunt. At the termination hearing, Thompson testified that N.M. was thriving in her current placement. Thompson further testified that she was able to meet N.M.'s current and future physical and emotional needs. When Murray was on the stand,

---

[7] Murray objected to the introduction of this evidence on the grounds that the convictions were not relevant to the proceedings because they were for misdemeanors that were remote in time and that they were unfairly prejudicial. *See* Tex. R. Evid. 402, 403. The trial court overruled his objections.

N.M.'s attorney ad litem asked him if he was able to meet N.M.'s physical and emotional needs. Murray did not respond, again invoking his privilege against self-incrimination.

The jury recommended that Murray's rights to N.M. be terminated, and the trial court entered an order doing so.[8] Murray now appeals, arguing that the trial court violated his privilege against self-incrimination by requiring him to assert the privilege on a question-by-question basis in front of the jury and that the trial court erred in admitting the recordings of his phone calls to his mother and grandmother and the evidence of his prior convictions.

## DISCUSSION

*Privilege Against Self-Incrimination*

In his first issue, Murray argues that the trial court violated his privilege against self-incrimination when it allowed the Department and N.M.'s attorney ad litem to question him in front of the jury after he informed the trial court that he intended to exercise the privilege. Murray further argues that the questioning allowed the jury to impermissibly draw a negative inference from his silence.[9]

---

[8] The Department did not seek to terminate Faske's rights to N.M. Rather, the Department requested, and the jury named, Thompson as N.M.'s managing conservator and Faske as possessory conservator. Faske does not appeal the trial court's judgment.

[9] Murray also argues that, by requiring him to invoke the privilege on the stand, the trial court somehow denied him his right to counsel and violated the attorney-client privilege. Murray does not clearly articulate how these actions violated his right to counsel or the attorney-client privilege, and we do not see any such violation. Murray was not questioned outside the presence of his attorney. Each time Murray was asked a question at the hearing, trial counsel stated that he was advising Murray to not answer, and Murray followed this advice. Murray was not asked, much less forced to answer, questions regarding his private communications with his attorneys.

Both the United States Constitution and the Texas Constitution protect an accused from being compelled to testify or give evidence against himself. *See* U.S. Const. amend. V; Tex. Const. art. I, § 10. This privilege protects Murray from having to answer questions, not just in criminal proceedings, but also "in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Allen v. Illinois*, 478 U.S. 364, 368 (1986); *In re Browning*, 113 S.W.3d 851, 852 (Tex. App.—Austin 2003, pet. denied). However, unlike in criminal proceedings, in civil proceedings there is no right to make a blanket assertion of the privilege and refuse to answer any questions. *See Allen*, 478 U.S. 364 at 375; *Browning*, 113 S.W.3d at 862; *In re Speer*, 965 S.W.2d 41, 46 (Tex. App.—Fort Worth 1998, orig. proceeding). Instead, the privilege must be asserted on a question-by-question basis. *Browning*, 113 S.W.3d at 862; *Speer*, 965 S.W.2d at 46. Therefore, we hold that the trial court did not abuse its discretion in requiring Murray to take the stand and assert the privilege on a question-by-question basis.

Furthermore, in a civil case, the fact finder may "draw reasonable inferences from a party's assertion of the privilege against self-incrimination." *Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001); *In re C.J.F.*, 134 S.W.3d 343, 352-53 (Tex. App.—El Paso 2003, pet. denied) (applying *Lozano* in parental rights termination proceeding). That does not change merely because there are pending criminal charges arising out of the same conduct. *Gebhardt v. Gallardo*, 891 S.W.3d 327, 330 (Tex. App.—San Antonio 1995, no writ). Therefore, the jury was free to draw a negative inference from Murray's refusal to answer questions about R.F.'s death or Murray's ability to care for N.M.

Murray next argues that because parental rights are constitutional in nature, the more protective standards of a criminal proceeding should apply. While it is true that a proceeding that

is labeled "civil" by the legislature can be considered a criminal proceeding for purposes of the self-incrimination clause, the determining factor is not the magnitude of the rights at issue in the proceeding, but whether the primary purpose of the proceeding is punishment.[10] *See Allen*, 478 U.S. at 368-69. The purpose of terminating a parent's rights is not to punish the parent for past conduct, but to protect the child and ensure that her best interests are served going forward. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Therefore, we hold that a termination proceeding is a civil proceeding for purposes of the privilege against self-incrimination. *See In re C.J.F.*, 134 S.W.3d at 352-53 (treating termination proceeding as civil for purpose of privilege against self-incrimination).

We overrule Murray's first issue on appeal.

*Admission of Evidence*

In his second and third issues, Murray complains that the trial court erred in admitting the recordings of his phone calls from jail to home on the night of R.F.'s death and in admitting evidence of his prior criminal convictions. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004). We may not

---

[10] We note that the rights to property and liberty are also constitutional in nature, yet the privilege against self-incrimination must be exercised on a question-by-question basis in front of the finder of fact and its invocation can result in a negative inference in tort cases (which bear the risk of property deprivation) and in civil commitment proceedings. *See Allen v. Illinois*, 478 U.S. 364, 370-71 (1986) (civil commitment); *Ward v. Dallas Tex. Nat'l Title Co.*, 735 S.W.2d 919, 921 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (civil conspiracy).

11

declare a trial court's ruling to be an abuse of discretion simply because we would have reached a different conclusion. *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004).

Murray contends that the trial court's decision to admit the recorded phone conversations and the prior convictions was an abuse of discretion because neither are relevant to the issues at trial. He further contends that even if the evidence is relevant, its probative value is outweighed by its prejudicial impact.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Tex. R. Evid. 401. In a termination proceeding, the Department must prove one of the alleged statutory grounds for termination—in this case that Murray endangered N.M.'s physical or emotional well-being—and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001. Therefore, any evidence that makes it more or less likely that Murray endangered N.M.'s physical or emotional well-being or that relates to N.M.'s best interest is relevant.[11] Relevant evidence should nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *In re K.Y.*, 273 S.W.3d 703, 710

---

[11] Evidence relevant to the best-interests determination includes but is not limited to: (1) the desires of the child; (2) the current and future emotional needs of the child; (3) the current and future emotional and physical dangers to the child; (4) the parental abilities of those seeking custody; (5) the programs available to assist those individuals in caring for the child; (6) the plans for the child by these individuals or the agency seeking custody; (7) the stability of the home or proposed placement; (8) any acts or omissions by the parent indicating that the existing parent-child relationship is improper; and (9) any excuse for the acts and omissions by the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also Harris v. Texas Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 836 (Tex. App.—Austin 2007, no pet.) (applying *Holley* factors).

(Tex. App.—Houston [14th Dist.] 2008, no pet.). To exclude evidence under Rule 403 "'is an extraordinary remedy that must be used sparingly.'" *Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248-49 (Tex. App.—Austin 1995, no writ) (quoting *LSR Joint Venture No. 2 v. Callewart*, 837 S.W.2d 693, 698 (Tex. App.—Dallas 1992, writ denied)).

The trial court did not abuse its discretion in overruling Murray's objections to the admission of the phone calls. The phone calls were relevant to whether Murray was responsible for R.F.'s death. *See In re C.J.F.*, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, pet. denied) (abuse of one child is fact tending to show endangerment of another child); *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 354 (Tex. App.—Austin 1993, no writ) (same). Through the recorded phone conversations, the jury was able to hear Murray's explanations for the injuries—which ranged from R.F. having fallen off a chair to Murray admitting that he hurt R.F.—as well as Murray's complaints about R.F.'s tendency to "run around all day" and his frustrations with trying to care for both R.F. and N.M. at the same time. This evidence tends to show that Murray grew frustrated with R.F., lost his temper, and abused R.F., causing the fatal injuries.

The phone calls are also relevant to the evaluation of N.M.'s best interests. In the phone calls, Murray expresses no remorse for R.F.'s death nor any concern for N.M., Faske, or any other family member. Rather, Murray spent most of the phone calls complaining about his own perceived mistreatment by Cabrera and Cervantes. This raises questions about Murray's ability to meet N.M.'s physical and emotional needs. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (best-interest determination includes current and future emotional and physical dangers to child and parental abilities of those seeking custody); *Harris v. Texas Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 836 (Tex. App.—Austin 2007, no pet.) (same).

13

Furthermore, Cervantes lived in the same home with Murray and had thus observed him interacting with both children. Therefore, Cervantes's statements—that she was afraid of Murray, that "there's something wrong with [Murray's] head," and that she believed he caused R.F.'s death—are directly relevant to Murray's parenting abilities and to whether he posed any future physical or emotional danger to N.M. *See Holley*, 544 S.W.2d at 371-72; *Harris*, 228 S.W.3d at 836.[12]

Murray did not explain to the trial court, and does not explain on appeal, how the phone calls are *unfairly* prejudicial. *See Goldberg v. State*, 95 S.W.3d 345, 367 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) ("The burden is on the opponent of the proffered evidence to demonstrate the prejudicial attributes of the evidence and to show how these attributes substantially outweigh the probative value of the evidence."). As we view the evidence, any prejudice against Murray is a fair prejudice stemming from the evidence's relevance to questions directly at issue in the hearing—whether Murray caused R.F.'s death, and in doing so endangered N.M., and whether termination is in N.M.'s best interest. *See Trevino*, 893 S.W.2d at 248 ("It is true that the confession and the facts surrounding the death of Leon constitute evidence that is inherently inflammatory and prejudicial; however, Texas Rule of Civil Evidence 403 requires that evidence must be *substantially* outweighed by the danger of *unfair* prejudice to be excluded."). We overrule Murray's second issue on appeal.

---

[12] Murray's threat of suicide is also relevant both to whether Murray endangered N.M. and to whether termination is in N.M.'s best interest. *See Liu v. Department of Family & Protective Servs.*, 273 S.W.3d 785, 800 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (threat of suicide by parent is relevant to best-interests determination); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("Threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child's physical or emotional well-being.").

Likewise, the trial court did not abuse its discretion in overruling Murray's relevancy objections to the evidence of his prior criminal convictions, even those that were more remote in time. At trial, Murray based his objections on the fact that the convictions were not for violent acts and some were more than ten years old. As the trial judge noted, these objections are grounded in Rule 609, which provides, in relevant part:

> (a) General Rule. *For the purposes of attacking the credibility of a witness*, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.
>
> (b) Time Limit. Evidence of a conviction *under this rule* is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Tex. R. Evid. 609 (emphases added). As the italicized portions of the rule suggest, rule 609 is not a categorical limitation on the introduction of convictions for any purpose. Rather, it applies only to convictions offered for purposes of impeachment. *Id.*; *see also Taylor v. Texas Dep't of Family & Protective Servs.*, 160 S.W.3d 641, 653 (Tex. App.—Austin 2005, pet. denied). Here, the Department offered Murray's convictions as evidence regarding the best interests of N.M. Murray's use of illegal drugs and his prior convictions are relevant to several of the *Holley* factors used in determining the best interests of the child. *See Taylor*, 160 S.W.3d at 653 (parent's criminal convictions, including those more remote in time, are relevant to best-interests determination); *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth, 2003, no pet.) (parental drug use relevant to

15

best-interests determination); *see also In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.—Waco 2000, pet. denied) (character evidence relevant to best-interest analysis).

Nor does the fact that several of the convictions were more than ten years old render the evidence more prejudicial than probative. *See Taylor*, 160 S.W.3d at 653 (mere age of convictions does not render them more prejudicial than probative). We also note that it is highly unlikely that evidence of these misdemeanor convictions would inflame a jury that heard disturbing and detailed medical evidence regarding the severe and brutal injuries R.F. suffered while in Murray's care, nor that the jury's verdict turned on the misdemeanor convictions. *See Trevino*, 893 S.W.2d at 849 ("To reverse a judgment based upon an erroneous evidentiary ruling, the court must review the evidence in light of the entire record to determine if 'the whole case turns on the particular evidence . . . admitted.'" (quoting *Dudley v. Humana Hosp. Corp.*, 817 S.W.2d 124, 126 (Tex. App.—Houston [14th Dist.] 1991, no writ))). We overrule Murray's third issue on appeal.

## CONCLUSION

Having found no error, we affirm the trial court's decree of termination.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   August 13, 2009

16