# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-25-00015-CV

---

**C. M. , Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

FROM THE 146TH DISTRICT COURT OF BELL COUNTY
NO. 309736, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant C.M. (Father) appeals from the trial court's final decree terminating his parental rights to his five-year-old child, Ben.[1]  On appeal, Father asserts that the evidence was legally and factually insufficient to support the jury's findings that (1) various statutory predicate grounds existed to support termination and (2) termination was in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (Q), (2).  Father also argues the trial court abused its discretion in (3) failing to timely rule on trial counsel's motion to withdraw, (4) overruling evidentiary objections under Texas Rule of Evidence 403, (5) denying Father's request for a mistrial based on an alleged *Batson* violation, (6) denying Father's request for a mistrial at the

---

[1] For the child's privacy, we will refer to him by an alias and his family members by their relationships to him. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

conclusion of voir dire, and (7) denying Father's request for a bench warrant and limiting Father's communications during trial between Father and his attorney. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY[2]

A jury trial took place over the course of three days where the jury heard testimony from Father, M.M. (Mother), a Department of Family and Protective Services (Department) supervisor, Ben's caregiver (Caregiver), Ben's guardian ad litem, Father's two adult sons from previous relationships, and Father's ex-wife.

Father and Mother are the biological parents of Ben, who was five years old at the time of trial. Mother and Father began dating in 2016 and were in an "on and off" relationship until 2019. In late 2018, Mother discovered that she was pregnant with Ben; at the time, her relationship with Father was "horrible" and the two were barely on speaking terms. Mother testified that Father knew about the pregnancy and that his reaction to it was "indifference." At that time, Mother and Father were living in Michigan. Shortly thereafter, in January 2019, Mother traveled with Father to Texas so that Father could attend a hearing to address an active warrant relating to an alleged crime against one of his ex-girlfriends—J.S. Father claimed the warrant was based on false allegations made by J.S. Mother testified that J.S. had previously moved for a protective order against Father and that she had met J.S. during the hearing on the motion. Mother testified that during the trip to Texas she witnessed Father bring J.S. and J.S.'s friend, M.S., to a home in the Killeen area where he killed them. Father, a former mixed martial arts fighter, strangled them in a chokehold while they were handcuffed. Mother stated that Father put their bodies in garbage bags and then the two drove to Austin to dispose of M.S.'s car. Mother testified

---

[2] The facts are derived from the testimony and evidence admitted at trial.

2

that she followed Father's directives because she was afraid of him after witnessing him kill J.S. and M.S. After disposing of the car, Father and Mother put the bodies in their car and drove to Oklahoma, where Father buried them. Mother was approximately twenty weeks pregnant with Ben at the time the murders occurred. Mother and Father were both arrested for the murders and disposal of the bodies shortly thereafter.

Ben was born on June 2, 2019. A Department supervisor testified that a Department investigator met with Mother at the hospital immediately after Ben's birth. Mother explained to the investigator that she was incarcerated at the Bell County Jail on charges of capital murder and tampering with evidence and that she did not make arrangements for her son's care after his birth. Mother told the Department that her family did not wish to care for the child and that she did not have any family support. As a result, the Department sought to remove Ben because he was left without a caregiver with both parents incarcerated and no plan for anyone else to care for him. The Department filed its Original Petition for Termination the next day on June 3, 2019, requesting temporary managing conservatorship of Ben.

The supervisor testified that the Department developed a service plan for Father and that the initial service plan goal was family reunification, even though both parents were confined in the county jail. She explained that the Department does not facilitate visits with parents confined at a jail or prison facility, especially for a child of Ben's age. She stated she provided information about Ben to Father, including medical information and developmental milestones, and provided Father with photos of Ben. When the original suit reached one year, both Mother and Father still had pending criminal cases related to the murders. The parties agreed that the Department would be appointed Ben's permanent managing conservator until the criminal cases had resolved and that then they would determine at that time what the permanent resolution for

3

Ben should be. On November 23, 2020, the trial court entered an Order Appointing Managing Conservator which appointed the Department as Ben's sole managing conservator, found that appointment of either parent as possessory conservator was not in Ben's best interest because such appointment would endanger his physical and emotional welfare, and prohibited visitation. In June 2023, a jury convicted Father of capital murder and sentenced him to death.[3] On December 28, 2023, the Department filed an Original Petition to Modify based on Father's conviction and sentence.

Ben has never met Father. At the time of trial, he was living with Caregiver's family out of state where he has resided since he was six months old. He lives there with his ten-year-old half-sister—Mother's first biological child—whom Caregiver adopted when she was around six years old. Caregiver testified at trial that it was her family's wish to adopt Ben. Mother testified that she would voluntarily relinquish her rights to Ben so that he could be adopted by Caregiver. At the close of trial, the jury returned a verdict recommending termination of Father's parental rights under Family Code subsections 161.001(b)(1)(D), (E), (N) and (Q) and found that termination of Father's parental rights was in Ben's best interest. The trial court accepted these findings and terminated Father's rights to Ben and named the Department permanent managing conservator of Ben. Father timely appealed.

## DISCUSSION

We review the sufficiency of the evidence supporting a trial court's termination decree under well-established standards. The Department must prove by clear and convincing

---

[3] Mother pleaded guilty to two counts of tampering with a corpse and was sentenced to twenty years' incarceration.

evidence at least one statutory ground for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id*. at 630–31. In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* An appellate court must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

## I.      Statutory predicate grounds

In his first four issues, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that (1) Father put Ben in an endangering environment, (2) Father engaged in endangering conduct, (3) Father constructively abandoned

5

Ben, and (4) Father knowingly engaged in criminal conduct resulting in his imprisonment and inability to care for Ben. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (Q).

We review termination findings that are based on subsection (E) first because of its significant collateral consequences. *See In re N.G.*, 577 S.W.3d 230, 235–36 (Tex. 2019) (per curiam) (explaining that appellate court must review sufficiency of evidence supporting subsection 161.001(b)(1)(D) or (E) grounds when parent has presented issue because endangerment findings may be used as basis for terminating parental rights in subsequent proceedings involving other children).[4] Thus, we begin by analyzing whether there is evidence to support termination under subsection (E).

Under subsection (E), termination may occur if the parent has engaged in conduct or knowingly placed that child with persons who engaged in conduct which endangers the child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Termination under subsection (E) must be based on a voluntary, deliberate, and conscious course of conduct. *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (cleaned up). A parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being. *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex.

---

[4] Because those collateral consequences are identical whether termination of parental rights is supported under subsection (D), or (E), or both, we need only review the sufficiency of evidence supporting one of those grounds. *See J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.). *But see id.* at *12–14 (Theofanis, J., concurring) (opining that courts should review evidentiary-sufficiency findings under both subsections (D) and (E) when challenged).

App.—Fort Worth 2011, pet. denied) (stating that stability and permanence are paramount in upbringing of children).

In considering subsection (E), "the focus is on the parent's conduct—including acts, omissions, or failures to act—and, specifically, on whether the evidence shows that the parent engaged in 'a voluntary, deliberate, and conscious course of conduct' that endangered the child's physical or emotional well-being." *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). A parent's conduct that occurs before the person's children are born can be a relevant factor in establishing the endangering course of conduct required under subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that parent's history of "irresponsible choices" is probative evidence that parent has engaged in endangering conduct). The factfinder may consider the parent's conduct before and after the child was born and may infer that a parent's absence from the child's life endangers the child's emotional well-being." *V.P.*, 2020 WL 544797, at *4 (citing *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.)). "[E]vidence of criminal conduct, convictions, or imprisonment may support a finding that the parent engaged in a course of conduct that endangered the well-being of the child under Subsection E." *In re A.R.M.,* No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.).

Here, the Department supervisor opined that a parent committing murder constitutes endangering conduct for a child because of the violent circumstances that show the parent to be unsafe and the parent's subsequent incarceration leaving the child without a caregiver. And, despite claiming innocence on the capital murder convictions, Father admitted at trial that he had a role in disposing of the bodies. In addition, the undisputed evidence at trial showed that, in

7

addition to the capital murder convictions, Father had a history of threatening and violent behavior, especially against women. Father had another pending charge in Minnesota for murdering a former girlfriend in 2009. The evidence showed that she went missing in 2009 right before a custody hearing regarding her and Father's minor son and was never seen again. The evidence showed that authorities in Minnesota have charged Father with her murder. Similarly, Father was convicted of murdering J.S. after she filed a protective order against him. Lastly, Father admitted that he pleaded guilty to telephone harassment in 2008 against another former partner. Finally, in sentencing Father to death, the jury found "beyond a reasonable doubt that there is a probability that [Father] would commit criminal acts of violence that would constitute a continuing threat to society." *See Walker v. Texas Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (considering offenses that occurred before child was born as part of voluntary, deliberate, and conscious course of conduct that had effect of endangering child); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (father's incarceration affected his ability to ensure that child was properly cared for, prevented him from finding better living conditions or providing financial support for child, and indicated course of conduct that was endangering to child). We conclude that Father's previous actions demonstrate a voluntary, deliberate, and conscious course of conduct that endangered Ben's physical or emotional well-being and thus the evidence was legally and factually sufficient to support termination under subsection (E). *See* Tex. Fam. Code § 161.001(b)(1)(E). Because we have concluded the evidence is sufficient to support a finding under subsection (E), we need not analyze the other challenged statutory predicate grounds. *See In re N.G.*, 577 S.W.3d at 232 ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in

8

addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.").

We overrule Father's first four issues.

## II.    Best interest

We turn next to Father's challenge to the jury's best-interest finding.  We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the child's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the child, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct.  544 S.W.2d 367, 371–72 (Tex. 1976).  The *Holley* factors are not exhaustive and need not all be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."  *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).  The child's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs.  *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  A parent's rights may not be terminated merely because the child might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would

9

better serve the child's best interest. *See L.R.*, 2018 WL 3059959, at *1. Although a strong presumption exists that a child's best interest is served by keeping the child with his or her biological parents, that presumption disappears when confronted with evidence to the contrary. *See In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

Ben was about five-and-a-half years old at the time of trial. He was born when Father was incarcerated awaiting his criminal trial for capital murder and has never met Father. Father's two sons testified that they had never met Ben and that they had no desire to do so in the future. The Department supervisor testified that, throughout the case, Father did not appear to show any interest in Ben. Father did not ask anything about Ben except to have his last name changed. She stated that, when she provided Father with photos of Ben, Father would look at the photo briefly and then flip it over so that he could not see the picture. This made her think that Father was not interested in Ben. When Father testified, he explained that he turned over the pictures to keep from breaking down. Father told the jury that he sent Christmas gifts to Ben through a local organization that works with inmates; Caregiver testified she received generic gifts from a county organization one Christmas but noted that none of the gifts were personalized for Ben. One of Father's adult sons testified that Father never talks about Ben other than "this case." Father's ex-wife testified that she contacted the Department on Father's behalf to get pictures of Ben because he had not received any in several months. On appeal, Father points to testimony that Caregiver's family qualified for the Permanency Care Assistance Program, which is an alternative to adoption; under that program, Caregiver could receive anywhere from $400–$545 per month for Ben until he is 18 years old, Ben would qualify for free state college needs, the

10

parental rights would not be terminated, and Ben could return to his biological parents if something tragic happened to Caregiver. Father's sons both testified that Father has never been violent to them and that he was a good dad to them growing up. Mother testified that, from what she observed during her time living with Father and two of his sons, that he was a great parent and he was never violent towards his children. His ex-wife testified that Father has never physically assaulted her.

We conclude that the evidence against the jury's finding on best interest is not so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d at 344. This is because the jury also heard testimony that Ben had been living with Caregiver since he was six months old and that Caregiver and her family wished to adopt him. Caregiver testified that Ben calls her "mom" and her partner "dad," and that their home is the only one he has ever known. Ben also enjoys playing with his biological half-sister, who Caregiver adopted several years ago. Father stated his concerns that Ben—who is biracial—would grow up in Caregiver's all Caucasian family and would not know the "Black side" of his family. Caregiver responded that Ben could choose to meet Father's side of the family when he is an adult, and that "if he chooses to make that decision, then [she] will support him and help him." Caregiver stated that she was concerned about Father's family's "continued loyalty" to him. The Department supervisor testified that she had monthly video calls with Ben and believed that all of Ben's emotional and physical needs were being met by Caregiver, and that she had no concerns with Caregiver's ability to parent Ben and that she trusted Caregiver to make the decision of whether to permit Ben to ever meet anyone from his paternal side of his family. And, while Mother testified that she witnessed Father being "a great father" to his two sons, she also testified that Father uses his children as pawns, and that he is extremely manipulative and dangerous, "even from behind bars . . . his reach extends beyond death row." She believed the

11

best thing for Ben was to keep him safe from Father, stating: "I am begging this jury to terminate his rights." Mother, Caregiver, the Department supervisor, and Ben's guardian ad litem all testified that they believed it would be in Ben's best interest to terminate Father's parental rights so that Caregiver could adopt him. *See L.R.*, 2018 WL 3059959, at *1 ("factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered") (quoting *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.))).

Considering the totality of the evidence in light of the *Holley* factors, again giving proper deference to the jury's determinations of witness credibility and the weight to be given to the evidence, we conclude the evidence is legally and factually sufficient to support the trial court's finding that termination is in Ben's best interest. We overrule Father's fifth issue.

## III. Additional challenges

### A. Denying Father's request for bench warrant

Father argues the trial court erred in denying his request for a bench warrant and providing him inadequate time to consult with his attorney during trial.

We review a trial court's ruling on an inmate's motion for a bench warrant for an abuse of discretion. *In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). When a trial court determines an inmate is not entitled to appear in person, the court must consider allowing the inmate to participate "'by some other effective means,' such as by affidavit, deposition, or telephone." *J.G.*, 592 S.W.3d at 521 (quoting *Samaniego v. Office of the Atty. Gen. of Tex.*, No. 03-13-00014-CV, 2015 WL 1545933, at *2 (Tex. App.—Austin Apr. 3, 2015, no pet.) (mem. op.)). The inmate has

the sole burden "to request access to the court through these alternate means and to demonstrate why a trial court should authorize them." *Id.* at 522 (quoting *Brown v. Preston*, No. 01-16-00556-CV, 2017 WL 4171896, at *3 (Tex. App.—Houston [1st Dist.] Sept. 21, 2017, no pet.) (mem. op.)). Here, the record reflects that Father filed an "Application for a Bench Warrant," and alternatively, a "Motion for Telephonic or Virtual Availability." The trial court denied the request for a bench warrant but granted the alternative motion and allowed Father to testify via video conference. Father's Application for a Bench Warrant states no reason why his appearance in court was necessary; rather, it makes the sole statement that "[Father] has a right under the Texas Family Code to be present at the trial." Nor does Father explain in his appellate arguments why his physical presence was necessary. The record before us shows that Father was present via videoconference for all aspects of the trial, meaning he was able to hear all the witnesses' testimony and was able to testify in his case-in-chief. *See In re D.W.*, 498 S.W.3d 100, 120 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (finding no abuse of discretion where mother's presence at trial via videoconference allowed her to address issues "relevant to the retention of her parental rights" and "the best interest of the child," including "her future stability and her ability to provide emotionally, physically, and financially for her child"). We thus cannot conclude that Father met his burden to justify the necessity of his physical presence at trial.[5] *In re Z.L.T.*, 124 S.W.3d at 166.

---

[5] The transcript for the hearing on the motion for bench warrant was not included in the appellate record. Thus, we must presume the evidence at the hearing supported the trial court's decision. *See Sanadco Inc. v. Hegar*, No. 03-14-00771-CV, 2015 WL 4072091, at *2 (Tex. App.—Austin July 3, 2015, no pet.) (mem. op.) ("Without a reporter's record, we have no way to determine what evidence, if any, was adduced at the hearing and, therefore, whether the trial court abused its discretion . . . [w]e therefore assume the underlying proceeding was properly conducted and that sufficient evidence supported the trial court's decision.").

Father also complains that the trial court did not provide him with sufficient time to confer with his attorney during trial. But Father did not object to this at trial, thus failing to preserve the complaint for appellate review. *See* Tex. R. App. P. 33.1. But even assuming the issue was preserved, Father admits on appeal that he was given several opportunities to consult with his attorney; his complaints focus on length of time for such consultations:

- On the second day of trial, Father provided a note to the trial court that he would like to confer with his counsel; the court agreed and gave him five minutes to confer.

- Also on the second day of trial, the trial court allowed Father's counsel to confer with Father during the lunch recess; Father's counsel requested—and was allowed—a request to speak to his client for five minutes.

- Father's counsel was granted a 30-minute break to prepare for his case-in-chief and speak with Father.

- Father's counsel asked for an opportunity to speak with Father prior to calling him on redirect examination. The record reflects that the recess lasted for approximately twenty-seven minutes, from 10:17 a.m. until 10:44 a.m.

Father has not provided, nor have we found, any authority to suggest that these facts amount to a deprivation of Father's rights to participate meaningfully at trial. Thus, based on this record, we cannot conclude that the trial court abused its discretion. We overrule this issue.

## B. Father's requests for mistrial

### 1. *Batson*

Father challenges the trial court's denial of his request for a mistrial relating to a *Batson* challenge. *Batson v. Kentucky* holds that "racial discrimination in jury selection offends the Equal Protection Clause." 476 U.S. 79, 85 (1986). Under Texas law, "the use of a peremptory challenge to exclude a juror on the basis of race violates the equal protection rights of the excluded juror." *Goode v. Shoukfeh*, 943 S.W.2d 441, 445 (Tex. 1997). In reviewing a *Batson* challenge,

courts use a three-step process. *Id.* In the first step, "the opponent of the peremptory challenge must establish a prima facie case of racial discrimination." *Id.* "During the second step of the process, the burden shifts to the party who has exercised the strike to come forward with a race-neutral explanation." *Id.* "At the third step of the process, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination, and the trial court may believe or not believe the explanation offered by the party who exercised the peremptory challenge." *Id.* at 445–46. We review both a trial court's ruling on a *Batson* challenge and a court's denial of a motion for mistrial for an abuse of discretion. *Id.* at 446.

Here, Father's attorney made a *Batson* challenge based on the attorney ad litem's striking of three Black members of the jury panel. In response to the challenge, the attorney testified that he chose to strike the three individuals based on their answers to questions about their level of concern that (1) the parents were being given separate trials and (2) that Father's criminal case was still on appeal—with 1 being the least concerned to 10 being very concerned. The attorney explained that he struck Juror No. 4 because his answers were 10 and 5, respectively; he struck Juror No. 13 because he answered 7 and 7; and he struck Juror No. 23 because she answered 7 and 8. Father's attorney did not dispute that these jurors provided these answers. Thus, because Father and Mother's criminal cases and Father's appeal were central issues in the trial, we conclude that the trial court could have reasonably determined that the three potential jurors' answers constituted a race-neutral explanation for the attorney ad litem's strikes. *See id.* at 445. Based on the record before us, we cannot conclude that the trial court abused its discretion in denying Father's motion for mistrial in connection with his *Batson* challenge. We overrule this portion of Father's issue.

15

## 2. Dismissal of Juror No. 73

Father argues the trial court abused its discretion in denying his motion for mistrial following the public dismissal of a potential juror. Specifically, he claims he was harmed by "the announcement by the Presiding Judge of the Trial court—in presence of the entire venire—that a potential juror would be released from jury duty without being struck by any counsel because [the potential juror] was the father of [J.S.]"—one of the victims in the capital murder case in which Father was convicted.

The record indicates that, during voir dire, the Department's attorney asked members of the venire panel whether any of them knew Father personally, whether they had heard of him, or whether they had any knowledge of him based on media coverage of the crime. Several members answered that they did. When the Department's attorney reached Juror No. 73, Juror No. 73 stated his name and then provided: "I am [J.S.'s] dad. I believe I'm probably disqualified." At that, the trial court stated: "Okay. Tell you what, if you have a seat here, we'll talk to you privately later. Okay, [Juror No. 73]?" Juror No. 73 was not questioned further. The record reflects that the potential juror did not state that J.S. was one of Father's victims, nor was that stated by any of the attorneys during voir dire. The record shows that by the time Juror No. 73 was questioned, the venire panel had already been informed by the trial court that Father had been convicted for capital murder and that he is currently incarcerated. However, neither the trial court nor the attorneys had informed the venire panel of any other details of the crime, including the names of the victims. If any of the potential jurors questioned after Juror No. 73 did recognize the name stated by Juror No. 73 and tied the name to Father's crime, none of them indicated that to the court; more importantly, none of the remaining members of the venire panel questioned indicated they could not be fair and impartial based on any knowledge they may have had of

16

Father's crime.[6]   Accordingly, on this record, we cannot conclude the trial court abused its discretion in denying Father's motion for mistrial on this basis.  We overrule this portion of Father's issue.

### C.  Objections to Mother's testimony

Father argues the trial court abused its discretion by allowing Mother to testify about the facts presented in Father's capital murder trial.  Father acknowledges that "murder may be relevant in a proceeding to terminate [his] parental rights," but argues that Mother's detailed testimony was unfairly prejudicial because the resulting unfair prejudice outweighs its probative value in determining Father's ability to care for Ben and what was in Ben's best interest.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  Tex. R. Evid. 401.  However, Rule 403 provides that relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  *See id.* R. 403.  "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."  *Murray v. Texas Dep't of Fam. & Protective Servs.*, 294 S.W.3d 360, 368 (Tex. App.—Austin 2009, no pet.).  The burden is on the opposing party to demonstrate how the evidence is unfairly prejudicial and substantially outweighs the probative value of the evidence.  *See id.* at 369.  Because the best interest of the child is "always the court's primary consideration, evidence relevant to the best interest of the child will seldom be excluded under rule 403."  *In re C.J.*, No. 05-98-01797-CV, 2001 WL 423279, at *4 (Tex. App.—Dallas

---

[6] The record shows that many members of the venire panel indicated that, due to their knowledge of the criminal case through the media, that they could not be fair and impartial; all of those jurors were excused for cause.

Apr. 26, 2001, no pet.) (mem. op.). Thus, the exclusion of evidence under Rule 403 is an extraordinary remedy that should be used sparingly in a parental rights termination case. *Garza v. Garza*, 217 S.W.3d 538, 555 (Tex. App.—San Antonio 2006, no pet.); *Trevino v. Texas Dep't. of Protective and Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ). Here, the evidence was undisputed that Mother was a witness to the murder of J.S. and M.S., and that she is currently in prison serving a 20-year sentence for her role in disposing of the bodies. Mother testified that she witnessed Father killing the two victims by putting them each in a chokehold from behind, and that she knew they were dead when she heard gargling and choking sounds. What Father has done in the past—especially his violent acts—is relevant to Ben's best interest, *see Holley*, 544 S.W.2d at 371–72, and given the fact that the jury already knew Father had been convicted of the most serious crime under Texas law and that the criminal jury had found no mitigating circumstances present to decide to spare his life, we cannot conclude that Mother's testimony regarding the chokehold unfairly prejudiced the jury against Father to such a degree that it substantially outweighed the probative value of the evidence. *See In re D.O.*, 338 S.W.3d 29, 37 (Tex. App.—Eastland 2011, no pet.); *Murray*, 294 S.W.3d at 369. Therefore, we cannot conclude that the trial court abused its discretion in concluding that Father failed to satisfy this burden. We overrule this issue.

### D. Motion to withdraw

Finally, Father argues that the trial court abused its discretion in failing to timely rule on Father's trial attorney's motion to withdraw and motion to appoint appellate counsel. Father argues that the trial court granted the motion on January 7, 2025, one day before his notice of appeal was due. Father fails to explain how this was an abuse of the trial court's discretion, but

more importantly, he fails to demonstrate any harm suffered as a result. Father was appointed an attorney on appeal; while the attorney may have only had one day to file the notice of appeal, the appeal was nevertheless timely filed; so too was the appellant's brief, which this Court has considered on the merits. *See* Tex. R. App. P. 44.1(a)(1) (no judgment may be reversed on appeal on ground that trial court made error of law unless court of appeals concludes that error complained of probably caused rendition of improper judgment or probably prevented appellant from properly presenting its case to court of appeals). We overrule this issue.

## CONCLUSION

Having overruled Father's issues, we affirm the trial court's decree terminating Father's parental rights to Ben.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed: May 23, 2025